1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEANGELEO ANTOINE HUGHES,

11          Petitioner,              2:  10 - cv - 3024 WBS TJB

12      vs.

13   JAMES WALKER,

14          Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                     I.  INTRODUCTION

17        Petitioner is a state prisoner and is proceeding with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.[1]  Petitioner was convicted by a jury of first degree murder and

19   attempted robbery.  The jury also found true a special circumstance felony murder and that

20   Petitioner personally used a weapon.  Petitioner was sentenced to life in prison without the

21   possibility of parole with a consecutive term of twenty-five years to life imprisonment for the gun

22   enhancement.  Petitioner raises three claims in this federal habeas petition; specifically:  (1) his

23   constitutional rights were violated when the court instructed the jury on implied malice when

24

25          [1] Petitioner was represented by counsel when his petition and traverse were filed.
26   However, in April 2011, Petitioner's counsel was terminated and Petitioner is now proceeding
     *pro se*.

                                    1

1  Petitioner was only charged with first degree murder ("Claim I"); (2) his constitutional rights

2  were violated when he was not given the opportunity to cross-examine a witness (Timothy Clay)

3  at trial as his preliminary hearing testimony was used instead ("Claim II"); and (3) his

4  constitutional rights were violated when the prosecutor impugned the integrity of defense counsel

5  at trial ("Claim III").  Petitioner has filed a motion to stay his federal habeas petition.

6  Respondent opposes the motion to stay.  For the following reasons, Petitioner's stay motion

7  should be granted.

8                         II.  FACTUAL BACKGROUND[2]

9  Defendant and his friend Jamar Woodson agreed to help
   Woodson's cousin Alexander Glaude, find someone to sell him
10  marijuana.  Glaude followed defendant and Woodson as they drove
   from Fairfield to the apartment of O'Brian Buchanan at 1718 Santa
11  Clara Street in Vallejo.

12  Buchanan lived on the ground floor of a two-story apartment
   building and a stairway to the second floor units was just outside
13  his apartment door.  A walkway along the north side of the
   building leads to a rear parking lot.

14

15  Glaude arrived there carrying $1,753 in cash between 11 p.m. and
   midnight with his girlfriend, Lynesse Hamilton.  He parked in the
16  rear parking lot, told Hamilton he would return soon, and went
   inside.  He returned about 15 minutes later and moved the car to a
17  spot on Santa Clara Street, across from the apartment building.  He
   left Hamilton waiting in the car with the engine running and
   returned to Buchanan's apartment.

18

19  Sometime later Hamilton noticed a man standing near the corner of
   Buchanan's apartment with a white shirt or towel covering his
20  face.  She thought he had a gun because of the way he was holding
   his hands, but she did not see any weapon.  The man was a medium
21  build and dark complected or wearing a dark shirt.  Glaude
   emerged from the apartment about 15 feet from where the man was
22  standing and tussled with someone near the front of the building.
   Hamilton heard gunshots and was frightened.  She ducked and then
23  moved the car onto the street.  As she did so she heard more
   gunshots.  When Glaude did not appear after a couple of minutes,
24  she drove to the next block and asked a woman to call 911.

25  _____

26  [2] The factual background is taken from the California Court of Appeal, First Appellate
   District, Division Three opinion dated August 22, 2008 and filed by Respondent in this Court as
   Exhibit 7 on February 4, 2011 (hereinafter the "Slip Op.").

Eileen Vargas lived on the second floor in Buchannan's [sic] apartment building.  Shortly after midnight she heard men arguing in the stairwell area about "weed," followed quickly by gunshots.  She heard a muffled voice say "Don't look at my face" and "Do you want me to uncover my face?"  Then the voice said "Get down on the ground" and demanded "Where's the money?["] and "Where's the shit?"  After that she heard two series of gunshots that totaled about six shots.  The first series of shots came from the front corner area of the building at the bottom of the stairs.  The second series sounded like it came from the back of the building.  Then she heard someone say "I've been shot in the hand."

Jerry Rozewski lived across the street from Buchanan's apartment complex.  Shortly after midnight he also heard gunshots coming from the apartment.  From his window he saw a man holding his left arm leave the apartment complex and get in the back seat of a car facing the wrong way on Santa Clara Street.  Rozewski was unable to get a good view, but he could see that the man was an adult African-American with probably a shaved head.

Timothy Clay was 19 years old at the preliminary hearing.  He was playing video games with four or five friends in Buchanan's apartment the night of the shooting, when Woodson (known as "Mar") and defendant (known as "Turtle," "Wax," or "Turtle Wax") arrived.  Woodson and defendant kept entering and leaving the apartment.  Their behavior made Clay nervous, so he left.  He walked out to the front of the apartment complex and tried to call his friend Alton, who was still inside.

Detective Robert Reynolds interviewed Clay two days after the shooting.  Reynolds testified that Clay initially denied that he witnessed the shooting and claimed he was inside the apartment at the time, but after further questioning Clay acknowledged that he was outside at the time, and he identified the defendant as the shooter.  He was in front of the apartment when he saw a man with a white shirt or cloth covering his face.  He described the man as about six feet tall and weighing 220 to 230 pounds.  The assailant was holding a gun in each hand and ordered Glaude and Woodson to lie on the ground.  They complied at first, but then Glaude got up and fled.  Defendant fired three shots.  He hit Glaude at least once and shot himself in the hand.  Glaude went down, but when defendant dropped one of his guns Glaude got up and fled down the walkway toward the back parking lot.  Defendant picked up his gun and fired two or three more shots at Glaude.  Then, defendant and Woodson ran across Santa Clara Street and got in a car.

Over defense objections, Clay was declared an unavailable witness and his preliminary hearing testimony was read to the jury.  In the preliminary hearing Clay denied that he saw the shooting and was questioned about the statements he made to Detective Reynolds two days after the shooting.  He disavowed his earlier statement to

Detective Reynolds, and claimed he was merely repeating what Buchanan had told him might have happened.  The prosecution impeached Clay's recantation with his prior statement to the detective.

After the shooting defendant and Woodson drove from Vallejo to San Francisco General Hospital to get defendant's hand treated. An emergency room surveillance tape showed that defendant arrived not wearing a shirt.  When he was questioned by police in the emergency room, defendant said he had been robbed and shot in West Point.  When officers went to West Point, they found no evidence of a crime.

*The Investigation*

Vallejo Police Corporal Steve Darden arrived at the scene at 12:16 a.m. shortly after the shooting.  Glaude was lying in the shrubbery in the back of the complex.  He had been shot and was in bad condition.  Darden saw two distinct trails of blood leading from the area of the shooting, one led down the stairwell along the northeast side of the complex to where Glaude was laying in the bushes.  The other went the opposite direction, to the spot on Santa Clara Street, where the injured shooter got in a car.

Several bullet fragments and two spent casings were found in the stairway area next to the entrance to Buchanan's apartment.  Three more casings and additional bullet fragments were found near the driveway.  Defendant's white shirt was in the stairwell with a bullet fragment on top of it.

DNA testing confirmed that blood on the T-shirt was defendant's.  [FN 1]  His blood was also found in samples from both blood trails, indicating that defendant pursued Glaude down the north walkway to the parking lot before he fled south along the street to his car.

> [FN 1]  The genetic profile in the bloodstain would be expected to occur in only one in 433 quadrillion African-Americans.

A forensic pathologist testified that Glaude was shot four times:  once through his right hand, twice in the front of his left thigh, and once in the center of his back.  His hand was shot from a distance of a few inches, and the lethal wound to his back was fired from approximately one or two feet away.

Cell phone records showed defendant called Woodson around five minutes before the murder.  In the four hours before the murder, Woodson called Glaude's cell phone 15 times.  The final call was 10 minutes before the murder.

4

After he was arrested, defendant told his girlfriend in a telephone call from jail: "Hey, you know, where I fucked up at?  [¶]  Going to the hospital."

*Defense*

Defendant testified that sometime on the day of the shooting, Glaude called Woodson to ask about buying marijuana.  Woodson and defendant met Glaude in a parking lot in Fairfield and Glaude followed them in his car to Buchanan's apartment.  Defendant went into the apartment with Woodson and Glaude and waited as they talked, but he grew impatient and left after 10 or 15 minutes.

Defendant said he tried to drive to the freeway, but got lost and found himself back on Santa Clara Street driving in the wrong direction.  He parked and walked back towards Buchanan's apartment via the rear driveway.  As he turned the corner, he said he stumbled into the middle of a robbery.  Glaude was lying prone on the ground and a man wearing some kind of white mask was standing over him and started to approach.  Defendant grabbed the gun and they wrestled.  Glaude got up and came to defendant's assistance.  The robber started shooting.  Defendant managed to free himself from the robber's grasp, but more shots were filed as he ran up the stairs and he was hit in the hand.

Defendant fled along the north walkway and around the front of the building, and lost his T-shirt as he ran.  He ran to his car and drove away.  As he turned the corner he saw Woodson running and picked him up.  Defendant testified that they drove to San Francisco rather than to the hospital in Vallejo because he was afraid the gunman might come after him to "finish [him] off, so I was trying to get as far as possible."  He said he lied to the officers who questioned him in the emergency room because he was afraid of retribution from the assailants if he told the police about their operation.

(Slip Op. at p. 1-5.)

## III.  PROCEDURAL HISTORY

Petitioner appealed to the California Court of Appeal after his conviction and sentence. The California Court of Appeal affirmed the judgment on August 22, 2008.  Petitioner then filed a petition for review to the California Supreme Court.  The California Supreme Court summarily denied the Petition for review on December 10, 2008.

Petitioner filed his federal habeas petition on March 3, 2010 in the Northern District of California.  Respondent moved to transfer the federal petition to the Eastern District of

California.  On November 5, 2010, the Northern District of California ordered that the petition be transferred to the Eastern District of California.  On February 3, 2011 Respondent answered the petition.  Petitioner filed a traverse on February 22, 2011.

On September 30, 2011, Petitioner filed a motion to stay the federal habeas petition so that he can exhaust "newly discovered" claims.  Respondent opposes the stay motion.

### IV.  MOTION TO STAY

Petitioner requests a stay so that he can exhaust purportedly newly discovered claims. Petitioner asserts the following in his stay motion:

> On September 21, 2011, I received a letter from my mother which included a signed and notarized affidavit by Timothy Clay.  In the affidavit Clay makes statements for the first time about the murder and what he actually witnessed take place at that time.  In the affidavit Clay declares that he was jealous of me during that time because of a "romantic relationship" I was having with Miss Tasha Johnson, and that he lied to police when saying I committed the murder due to his jealousy over me.  Clay further declares that he did witness me walk into the real killer that night and that I in fact did not shoot and kill victim.  Clay declares that he was aiming to say that I committed the murder to receive a reward, if one were offered by the police for information.  Also Clay brings to the attention of the court that he received a $500 bribe to testify falsely in court while under lawful oath.  More importantly, Clay declares that the district attorney investigator told him not to come to trial and testify, and to get out town [sic] for awhile.  This information is critical, because Clay was not found or located by the prosecution for trial.
>
> It appears from this newly discovered evidence that the prosecution may have tampered with witness and that my conviction is based on conspiracy and perjury by prosecution witness Clay.

(Pet'r's Mot. Stay at p. 3-4.)

Petitioner initially filed his motion to stay pursuant to Rhines v. Weber, 544 U.S. 269 (2005).  Under Rhines, a district court has discretion to stay a mixed petition to allow a petitioner time to return to state court to present the unexhausted claims and then return to federal court for review of his perfected petition.  544 U.S. at 276.  This stay and abeyance is available in limited circumstances, and only when:  (1) there is "good cause" for the failure to exhaust; (2) the

1  unexhausted claims are potentially meritorious; and (3) the petitioner did not engage in abusive

2  litigation tactics or intentional delay.  See King v. Ryan, 564 F.3d 1133, 1139 (9th Cir. 2009)

3  (citing Rhines, 564 F.3d at 277-78).

4         Respondent argues that Petitioner's motion for a stay is more proper under Kelly v.

5  Small, 315 F.3d 1063 (9th Cir. 2002).  Petitioner concedes this point in his reply and requests a

6  stay under Kelly.

7         "Pursuant to the Kelly procedure, (1) a petitioner amends his petition to delete any

8  unexhausted claims; (2) the court stays and holds in abeyance the amended, fully exhausted

9  petition, allowing the petitioner the opportunity to proceed to state court to exhaust the deleted

10  claims; and (3) the petitioner later amends his petition and re-attaches the newly-exhausted

11  claims to the original petition."  King, 564 F.3d at 1135 (citing Kelly, 315 F.3d at 1070-71.)

12  Kelly requires the petitioner to delete unexhausted claims such that only exhausted claims are

13  stayed.  See King, 564 F.3d at 1135 (outlining the Kelly procedure).  Thus, under Kelly, a

14  petitioner must still amend to add his deleted claims within the one-year statute of limitation set

15  forth in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See id. at

16  1138-39; see also 28 U.S.C. § 2244(d)(1) ("A 1-year statute of limitation shall apply to an

17  application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State

18  court.").  In this case, Petitioner does not seek to stay a mixed petition.  Instead, he seeks to hold

19  his original three Claims in abeyance while he exhausts the new claims outlined in his stay

20  motion.  As Petitioner is seeking to stay a fully exhausted petition, Kelly is the relevant

21  procedure.

22         In step three of the Kelly procedure, a petitioner is only allowed to add his newly-

23  exhausted claims back into the federal petition if the claims either are independently timely under

24  AEDPA or "relate back" to the exhausted claims in the pending petition.  See King, 564 F.3d at

25  1140-41.  "An amended habeas petition does not relate back (and thereby escape AEDPA's one-

26  year time limit) when it asserts a new ground for relief supported by facts that differ in both time

7

1   and type from those the original pleading set forth." <u>Mayle v. Felix</u>, 545 U.S. 644, 650 (2005).

2   A new claim "relates back" to an existing claim if the two claims share a "common core of

3   operative facts." <u>Id.</u>, 545 U.S. at 659.  A new claim does not "relate back" to an existing claim

4   simply because it arises from "the same trial, conviction or sentence." <u>Id.</u> at 663-64.

5       AEDPA places a one-year statute of limitations on the filing of petitions for writ of

6   habeas corpus following final judgment from a state conviction.  <u>See</u> 28 U.S.C. § 2244(d).  Thus,

7   in this case the statute of limitations began to run ninety days after the California Supreme Court

8   denied Petitioner's petition for review on December 10, 2008.  <u>See</u> <u>Bowen v. Roe</u>, 188 F.3d

9   1157, 1159 (9th Cir. 1999) (for purposes of determining when judgment is final under §

10  2244(d)(1), period of direct review includes "the ninety-day period within which [the petitioner]

11  could have filed a petition for writ of certiorari from the United States Supreme Court").  As

12  previously indicated, Petitioner filed his federal habeas petition on March 3, 2010 which was

13  within the applicable AEDPA statute of limitations period.  However, the filing of this federal

14  habeas petition did not toll AEDPA's statute of limitations.  <u>See</u> <u>Duncan v. Walker</u>, 533 U.S.

15  167, 181 (2001).  Thus, Petitioner's newly discovered claims raised in his motion to stay filed in

16  September 2011 do not appear to be timely under AEDPA if they were raised anew.  Petitioner's

17  new claims must then either "relate back" to the original claims raised in the federal habeas

18  petition for a <u>Kelly</u> stay to be warranted or must be independently timely under AEDPA.

19      Petitioner's motion to stay raises two separate issues.  First, Petitioner asserts that Clay

20  committed perjury during the preliminary hearing.  Petitioner relies on the fact that Clay

21  purportedly received a $500 bribe to testify falsely in favor of Petitioner at preliminary hearing

22  ("Argument I").  Second, Petitioner argues that the prosecutorial investigator told Clay to leave

23  the county so that his preliminary hearing testimony would be used at trial instead ("Argument

24  II").  Petitioner asserts that the prosecutor engaged in a conspiracy to use the perjured testimony

25  of Clay at his trial.

26      Argument I is separated in time and type from the Claims Petitioner made in his federal

8

habeas petition.  Claim II of the federal habeas petition argues that the use of Clay's preliminary

hearing testimony violated his Confrontation Clause rights at trial.  Thus, Claim II focuses on a

decision that occurred at trial, specifically the trial court's use of Clay's preliminary hearing

testimony.  Argument I argues that Clay perjured himself during the preliminary hearing.  Thus,

Petitioner's new argument focuses on what occurred at the preliminary hearing, not at trial.

Argument I is therefore "separated in time and type" because one event arose from a pretrial

event (the preliminary hearing) and the original claim arose during his trial.  <u>See Mayle</u>, 545 U.S.

at 657 (claims separated by time and type between petitioner's own pretrial statements and

videotaped statements from a witness); <u>see</u> <u>also</u> <u>Hebner v. McGrath</u>, 543 F.3d 1133, 1138 (9th

Cir. 2008) (new proposed claim of improper admission of testimony did not relate back to initial

petition which raised jury instructional claim); <u>Proby v. Uribe</u>, Civ. No. 06-5679, 2009 WL

4120129, at *10-11 (C.D. Cal. Nov. 18, 2009) (finding that new claims that relate to trial, trial

preparation matters and ineffective assistance of appellate counsel for failing to raise new claims

on direct appeal did not relate back to original petition which raised claims based on errors in the

jury selection process).

Additionally, it is worth noting that Argument I does not satisfy 28 U.S.C. §

2244(d)(1)(D).  Section 2244(d)(1)(D) states AEDPA's statute of limitations begins to run on a

claim on "the date on which the factual predicate of the claim or claims presented could have

been discovered through the exercise of due diligence."  Clay asserts in his affidavit that

Petitioner bribed him to testify falsely at the preliminary hearing.  (<u>See</u> Pet'r's Mot. Stay, Aff.

Clay ¶ 44-45.)  Thus, Petitioner was clearly aware at least at the time of the preliminary hearing

in December 2004 of the factual predicate giving rise to Argument I.  Section 2244(d)(1)(D) does

not make Argument I timely under AEDPA.  Thus, Argument I does not warrant granting a

<u>Kelly</u> stay.

Argument II asserts that the prosecutor's office tampered with Clay's availability at trial.

In support of this argument, Petitioner attached an affidavit from Clay dated September 12, 2011

9

1   which stated the following:

2         My new plans to make misleading and false statements at
3         defendant Hughes trial was thwarted when, on or about June 3,
      2005, I received a call from the district attorney investigator
4         Gerrans at my mom's house.  I was really disappointed when I
      heard what the investigator had to say.  I was told that I "would not
5         attend and testify at trial." [sic] The investigator further told me
      that my "previous statements and testimony is going to be read in
6         court instead."  The investigator then instructed me to leave the
      county for a month or so, and to stay out of trouble.  So I stayed
7         away from my moms house until the middle of May 2006.  I knew
      when the trial had started and finally ended because, I would call
      the court weekly and ask the status of the case.

8

9   (Pet'r's Mot. Stay, Aff. Clay at ¶ 51.)

10         This new proposed claim relates back to Petitioner's federal habeas petition.  As

11   previously stated, Claim II of the federal habeas petition asserts that Petitioner's Confrontation

12   Clause rights were violated when the trial court allowed the use of Clay's preliminary hearing

13   testimony at trial.  The Sixth Amendment provides that a criminal defendant has the right to

14   confront the witnesses against him.  See U.S. Const. amend. VI.  This is a fundamental right

15   which applies to all out-of-court testimonial statements ("testimonial hearsay") offered for the

16   truth of the matter asserted.  See Crawford v. Washington, 541 U.S. 36, 68 (2004).  Testimonial

17   hearsay is inadmissible, unless (1) the witness is unavailable; and (2) the criminal defendant had

18   an opportunity to cross-examine the declarant at the action or proceeding where the testimony

19   took place.  See id.; Jackson v. Brown, 513 F.3d 1057, 1082-83 (9th Cir. 2008).  In Crawford, the

20   Supreme Court refused to spell out a comprehensive definition of what constitutes "testimonial,"

21   however, the Court explained that it applied "at a minimum to prior testimony at a preliminary

22   hearing, before a grand jury, or at a former trial; and to police interrogations."  541 U.S. at 68.

23         A witness is not unavailable for purposes of the exception to the Confrontation Clause

24   "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."

25   Barber v. Page, 390 U.S. 719, 725 (1968).  It is the prosecution's burden to demonstrate that it

26   took reasonable steps to secure the witness's presence at trial.  See Ohio v. Roberts, 448 U.S. 56,

74-75 (1980), <u>abrogated on other grounds by</u>, <u>Crawford</u>, 541 U.S. 36.  Thus, a fundamental

element in determining whether Petitioner's Confrontation Clause rights were violated at trial is

the due diligence that the prosecutor's office engaged in attempting to obtain Clay's presence at

trial.  The California Court of Appeal analyzed the prosecutor's office due diligence in deciding

Petitioner's Confrontation Clause claim on direct appeal.

      A petitioner's amendments made after the statute of limitations has run will relate back to

the date of his original pleading only if the claims arose out of the conduct, transaction, or

occurrence set forth or attempted to be set forth in the original pleading.  <u>See</u> <u>Mayle</u>, 545 U.S. at

656-57; Fed. R. Civ. P. 15(c) (a petitioner's amendments will relate back to the date of his

original pleading only if the new claims arose out of the conduct, transaction, or occurrence set

forth or attempted to be set forth in the original pleading).  In <u>Mayle</u>, 545 U.S. at 664 n. 7, the

Supreme Court gave examples of the types of claims that would relate back to the original

petition:

> For example, in <u>Mandacina v. United States</u>, 328 F.3d 995, 1000-
> 01 (8th Cir. 2003), the original petition alleged violations of <u>Brady
> v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),
> while the amended petition alleged the Government's failure to
> disclose a particular report.  Both pleadings related to evidence
> obtained at the same time by the same police department.  The
> Court of Appeals approved relation back.  And in <u>Woodward v.
> Williams</u>, 263 F.3d 1135, 1142 (10th Cir. 2001), the appeals court
> upheld relation back where the original petition challenged the trial
> court's admission of recanted statements, while the amended
> petition challenged the court's refusal to allow the defendant to
> show that the statements had been recanted.  See also 3 J. Moore,
> et al., Moore's Federal Practice § 15.19[2], p. 15-82 (3d ed. 2004)
> (relation back ordinarily allowed "when the new claim is base don
> the same facts as the original pleading and only changes the legal
> theory").

Argument II "relates back" to Petitioner's Confrontation Clause argument in Claim II.  Both the

Confrontation Claim raised in Claim II and Argument II relate to the prosecutor's actions (or

inactions) in attempting to obtain Clay's attendance at trial.  Thus, Argument II arises out of the

same "conduct, transaction or occurrence" as Claim II of the federal habeas petition.

1          Under <u>Kelly</u>, a court can deny a request for a stay if the new claims are facially without

2   merit.  <u>See</u> <u>King</u>, 564 F.3d at 1141 ("We further reiterate the 'clear appropriateness of a stay

3   when *valid* claims would otherwise be forfeited.'") (emphasis added) (quoting <u>Kelly</u>, 315 F.3d at

4   1070; <u>see also</u> <u>Berry v. Jacquez</u>, Civ. No. 10-305, 2011 WL 4738336, at *3 (E.D. Cal. Oct. 5,

5   2011) ("Thus in order to grant a stay and abeyance under <u>Kelly</u>, a court must determine that a

6   petitioner's unexhausted claim is not barred by the statute of limitations and also raises a valid

7   and not otherwise 'plainly meritless' claim."), <u>report and recommendation adopted by</u>, 2011 WL

8   6024454 (E.D. Cal. Dec. 2, 2011); <u>Maxwell v. Kramer</u>, Civ. No. 07-548, 2011 WL 3359029, at

9   *2 (E.D. Cal. Aug. 3 2011) (same); <u>Jones v. Runnels</u>, Civ. No. 04-950, 2008 WL 697700, at *1

10  (E.D. Cal. Mar. 14, 2008).  Argument II is not necessarily lacking in facial merit.  Respondent

11  asserts that Argument II lacks facial merit because "the fundamental unfairness about which he

12  complains is the introduction at trial of the alleged perjured preliminary testimony that he

13  secretly orchestrated specifically to undermine the prosecution."  (Resp't's Sur-Reply Opp'n Stay

14  at p. 3.)  While this maybe the unfairness that Petitioner alleges he suffered with respect to his

15  Confrontation Clause Claim, Argument II is more akin to prosecutorial misconduct.  The

16  prejudice Petitioner argues he suffered is not having Clay testify at trial according to the facts

17  outlined by Clay in his attached affidavit which implicated an unknown person in the crime

18  rather than Petitioner.  Clay's affidavit includes a narrative of the incident which gave rise to

19  Petitioner's conviction and includes Clay's statement that he "wrongly accused" Petitioner of the

20  murder.  Under these circumstances, Petitioner should be allowed to present this prosecutorial

21  misconduct claim in state courts in the first instance and the court should utilize its discretion to

22  grant the stay.

23          Respondent also argues that Clay's affidavit regarding the purported tampering issue is

24  unsustainable given the testimony of the prosecutor's investigator at trial.  As previously noted,

25  Clay's affidavit stated that he remained unavailable from June 2005 to May 2006.  Respondent's

26  sur-reply argues that this is plainly contradicted by the investigator's testimony which indicated

that Clay was served with several subpoenas during period.  More specifically, Respondent

asserts the following:

> Petitioner's trial was first scheduled for May 23, 2005, and with
> the assistance of Clay's mother, Investigator Gerrans successfully
> served Clay with a subpoena for the trial on May 10, 2005.  1 RT
> 67.  When petitioner's trial date was rescheduled for July 18, 2005,
> Investigator Gerrans, with the assistance of Clay's mother, was
> once again able to successfully subpoena Clay to testify at
> petitioner's trial.  1 RT 67-68.  Petitioner's trial was then
> rescheduled for February 27, 2006, and Investigator Gerrans (with
> much effort) again successfully served Clay with a subpoena for
> trial.  1 RT 68-69; 1 CT 122.  It was only after the trial date was
> continued to April 10, 2006, that Investigator Gerrans was unable
> to locate Clay.  1 RT 71; 1 CT 173.

(Resp't's Sur-Reply Opp'n Stay at p. 3.)  However, a review of the Reporter's Transcript relied

upon above by the Respondent does not indicate that Clay was served with a subpoena after May

2005.  The investigator testified as follows:

> A:  . . . on 5/10/05, 11:20 a.m., I received a call on my cell phone
> from Ketora Clay, mother of witness Timothy Clay.  She asked that
> I meet her at her home at 2:00 p.m. to meet with and subpoena her
> son that day.  At 2:30 p.m., Timothy Clay called – I went to the
> house.  I went back there at two o'clock.  At 2:30, Timothy Clay
> called his mother and said he can't make the meeting.  While the
> mother talked to him, he hung up the phone on his mother.  The
> son is not being cooperative.  At 2:40 p.m., Timothy called back
> and said he was on his way.  I guess he changed his
> mind.  [¶]  Anyway, at 3:15 p.m, after being at the house for an
> hour and 15 minutes, Tim showed up and I did serve a subpoena on
> him.  So that was the second time he was subpoenaed.
> Q:  On this occasion, that was for the May 23rd trial, true?
> A:  That's right.
> Q:  Were you again asked to attempt to serve Mr. Clay in
> connection with the trial set for defendant Woodson on or about
> July 18th of the year 2005?
> A:  That's right.
> Q:  How many attempts did you make to serve him?
> A:  This is the fourth time.  I have two pages.  I made eleven
> attempts.  The first on June the 2nd, '05.  I went to 6 Tolentino
> Drive to locate Timothy Clay.  No one home.
> On 6/3/05 at 3:55 p.m., I left a phone message for the witness's
> mother, Ketora Clay.  Timothy no longer residing at her residence.
> She made arrangements last time I served Timothy for him to meet
> us at the residence, so I could serve him.  I asked her to make those
> arrangements again.

1  On 6/8/05, I called Timothy Clay's mother, Ketora Clay, with no
   answer to the phone, no answer on – the answering machine wasn't
2  working for some reason.  At 11:40 a.m., I called back and the line
   was busy.  1:15, I called again and finally got a message, and I left
3  a message on the message machine for the mother to contact – to
   have the mother contact Timothy Clay for me.
4  On June 9th, '05, at 2:10 p.m., I called the witness's mother again,
   Ketora Clay.  No one home.  Just the answering machine.
5  On 6/10/05 at 8:00 a.m., I received a message on my cell phone
   from Ketora Clay.  She apologized for not calling me back.  She
6  said she will attempt to contact her son, so I can serve him with a
   subpoena.
7  THE COURT:  Before you go any further, why don't you fast
   forward to this gentleman's attempts to serve Mr. Clay for the
8  purposes of this hearing.
   MR. WILLIAMSON:  Okay.
9  THE WITNESS:  Okay.
   Q  MR. WILLIAMSON:  What I'd like to do is direct your
10 attention to our trial date of today April 10th of the year 2006.
   Where [sic] you requested again to serve Mr. Clay in order to
11 compel him to these proceedings?
   A:  I would just like to comment that there was a fifth time.  I have
12 seven pages of due diligence and 23 attempts prior to the trial.
   This was my fifth attempt, and I think that was for the trial that was
13 set for 2/27/06.
   Q:  Okay.  Let's go ahead then and move to this trial for April 10th.
14 A:  Okay.  The sixth time I tried to attempt to locate Timothy Clay,
   I have 11 pages of due diligence and 39 attempts for this trial to
15 subpoena Timothy Clay . . . .
   Q  MR. WILLIAMSON:  Mr. Gerrans, I'm going to show a copy
16 of an exhibit that's been marked Court Exhibit 1 for identification
   and ask you if that's a true and correct copy of your handwritten
17 notes concerning the diligence that you exercised in attempting to
   secure Mr. Clay's attendance at this trial by serving him with a
18 subpoena?
   A:  It is.
19 Q:  Now, do these notes truly and accurately document – how
   many attempts, did you say?
20 A:  39 attempts.
   Q:  – your attempts to locate him and serve him for this trial.
21 A:  That's correct . . . .
   Q:  To date, in connection with this trial, April 10th, were you ever
22 successful in getting Mr. Clay served?
   A:  No, I wasn't.  And I met with his family, his mother again, and
23 I could read all these 39 attempts.

24 (Reporter's Tr. at p. 67-72.)  Contrary to Respondent's argument, the above record is at best

25 unclear regarding whether the prosecutor was successful in serving Clay with a subpoena after

26

14

May 2005.[3]

Based on the foregoing, Petitioner has satisfied the requisite elements entitling him to a Kelly stay with respect to the issue of whether the prosecutor tampered with Clay's availability at trial.  This argument relates back to Claim II of the original federal habeas petition making the argument timely.

## V.  CONCLUSION AND RECOMMENDATION

Petitioner has shown that a stay would be appropriate in this case under Kelly for the reasons discussed in these findings and recommendations.

Accordingly, IT IS HEREBY RECOMMENDED that Petitioner's Motion to Stay (Dkt. No. 23) be GRANTED and Petitioner's federal habeas petition should be held in abeyance to afford Petitioner an opportunity to exhaust his state judicial remedies with regard to Argument II as set out in his stay motion.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

//

//

//

---

[3] The two Clerk's Transcript citations relied upon by Respondent do not establish that Clay was served after May 2005 and appear unrelated to the issue of whether Clay was successfully served between June 2005 and May 2006.

DATED:  January 31, 2012

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE