1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT
9              FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   DEANGELO ANTOINE HUGHES,                No.  2:10-cv-3024 WBS GGH
12              Petitioner,
13        v.                                 ORDER DENYING EVIDENTIARY
                                             HEARING
14   JAMES WALKER,
15              Respondent.
16
17

18   *INTRODUCTION AND SUMMARY*

19        Petitioner is a state prisoner proceeding, through counsel, with a petition for a writ of

20   habeas corpus pursuant to 28 U.S.C. § 2254.  A jury found petitioner guilty of first degree murder

21   and attempted robbery and found true sentencing enhancements of felony murder and personal

22   use of a firearm.  Petitioner challenges his conviction and sentence on the following grounds: 1)

23   violation of the Confrontation Clause by the introduction of prior testimony by Timothy Clay;

24   and 2) prosecutorial misconduct by dissuading a witness in the case to not appear at trial (based

25   on the Clay declaration and that of Ketora Clay).[1]  For the reasons set forth below, the court

26

27   _____
     [1] Petitioner initially stated three claims for relief which included a claim for prosecutorial
     misconduct based on the prosecutor's closing argument.  ECF No. 54.  Petitioner has abandoned
28   this claim.  ECF No. 73, at 2.

                                             1

concludes that an evidentiary hearing should not be held to determine the credibility of Timothy Clay as it relates to petitioner's claims, nor should the Ketora Clay declaration be considered.

*BACKGROUND*

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the First Appellate District provided the following factual summary:

> The Crime
>
> Defendant and his friend Jamar Woodson agreed to help Woodson's cousin, Alexander Glaude, find someone to sell him marijuana. Glaude followed defendant and Woodson as they drove from Fairfield to the apartment of O'Brian Buchanan at 1718 Santa Clara Street in Vallejo.
>
> Buchanan lived on the ground floor of a two-story apartment building and a stairway to the second floor units was just outside his apartment door. A walkway along the north side of the building leads to a rear parking lot.
>
> Glaude arrived there carrying $1,753 in cash between 11 p.m. and midnight with his girlfriend, Lynesse Hamilton. He parked in the rear parking lot, told Hamilton he would return soon, and went inside. He returned about 15 minutes later and moved the car to a spot on Santa Clara Street, across from the apartment building. He left Hamilton waiting in the car with the engine running and returned to Buchanan's apartment.
>
> Sometime later Hamilton noticed a man standing near the corner of Buchanan's apartment with a white shirt or towel covering his face. She thought he had a gun because of the way he was holding his hands, but she did not see any weapon. The man was of a medium build and dark complected or wearing a dark shirt. Glaude emerged from the apartment about 15 feet from where the man was standing and tussled with someone near the front of the building. Hamilton heard gunshots and was frightened. She ducked and then moved the car onto the street. As she did so she heard more gunshots. When Glaude did not appear after a couple of minutes, she drove to the next block and asked a woman to call 911.
>
> Eileen Vargas lived on the second floor in Buchannan's apartment building. Shortly after midnight she heard men arguing in the stairwell area about "weed," followed quickly by gunshots. She heard a muffled voice say "Don't look at my face" and "Do you want me to uncover my face?" Then the voice said "Get down on the ground" and demanded "Where's the money? and "Where's the shit?" After that she heard two series of gunshots that totaled about six shots. The first series of shots came from the front corner area of the building at the bottom of the stairs. The second series sounded like it came from the back of the building. Then she heard

2

someone say "I've been shot in the hand."

Jerry Rozewski lived across the street from Buchanan's apartment complex. Shortly after midnight he also heard gunshots coming from the apartment. From his window he saw a man holding his left arm leave the apartment complex and get in the back seat of a car facing the wrong way on Santa Clara Street. Rozewski was unable to get a good view, but he could see that the man was an adult African-American with probably a shaved head.

Timothy Clay was 19 years old at the preliminary hearing. He was playing video games with four or five friends in Buchanan's apartment the night of the shooting, when Woodson (known as "Mar") and defendant (known as "Turtle," "Wax," or "Turtle Wax") arrived. Woodson and defendant kept entering and leaving the apartment. Their behavior made Clay nervous, so he left. He walked out to the front of the apartment complex and tried to call his friend Alton, who was still inside.

Detective Robert Reynolds interviewed Clay two days after the shooting. Reynolds testified that Clay initially denied that he witnessed the shooting and claimed he was inside the apartment at the time, but after further questioning Clay acknowledged that he was outside at the time, and he identified defendant as the shooter. He was in front of the apartment when he saw a man with a white shirt or cloth covering his face. He described the man as about six feet tall and weighing 220 to 230 pounds. The assailant was holding a gun in each hand and ordered Glaude and Woodson to lie on the ground. They complied at first, but then Glaude got up and fled. Defendant fired three shots. He hit Glaude at least once and shot himself in the hand. Glaude went down, but when defendant dropped one of his guns Glaude got up and fled down the walkway toward the back parking lot. Defendant picked up his gun and fired two or three more shots at Glaude. Then, defendant and Woodson ran across Santa Clara Street and got in a car.

Over defense objections, Clay was declared an unavailable witness and his preliminary hearing testimony was read to the jury. In the preliminary hearing Clay denied that he saw the shooting and was questioned about the statements he made to Detective Reynolds two days after the shooting. He disavowed his earlier statement to Detective Reynolds, and claimed he was merely repeating what Buchanan had told him might have happened. The prosecution impeached Clay's recantation with his prior statement to the detective.

After the shooting defendant and Woodson drove from Vallejo to San Francisco General Hospital to get defendant's hand treated. An emergency room surveillance tape showed that defendant arrived not wearing a shirt. When he was questioned by police in the emergency room, defendant said he had been robbed and shot in West Point. When officers went to West Point they found no evidence of a crime.

/ / /

3

The Investigation

Vallejo Police Corporal Steve Darden arrived at the scene at 12:16 a.m. shortly after the shooting. Glaude was lying in shrubbery in the back of the complex. He had been shot and was in bad condition. Darden saw two distinct trails of blood leading from the area of the shooting, one led down the stairwell along the northeast side of the complex to where Glaude was laying in the bushes. The other went the opposite direction, to the spot on Santa Clara Street, where the injured shooter got in a car.

Several bullet fragments and two spent casings were found in the stairway area next to the entrance to Buchanan's apartment. Three more casings and additional bullet fragments were found near the driveway. Defendant's white T-shirt was in the stairwell with a bullet fragment on top of it.

DNA testing confirmed that blood on the T-shirt was defendant's. [N.1] His blood was also found in samples from both blood trails, indicating that defendant pursued Glaude down the north walkway to the parking lot before he fled south along the street to his car.

> [N1] The genetic profile in the bloodstain would be expected to occur in only one in 433 quadrillion African-Americans.

A forensic pathologist testified that Glaude was shot four times: once through his right hand, twice in the front of his left thigh, and once in the center of his back. His hand was shot from a distance of a few inches, and the lethal wound to his back was fired from approximately one to two feet away.

Cell phone records showed defendant called Woodson around five minutes before the murder. In the four hours before the murder, Woodson called Glaude's cell phone 15 times. The final call was 10 minutes before the murder.

After he was arrested, defendant told his girl-friend in a telephone call from jail: "Hey, you know, where I fucked up at? [¶] ... [¶] Going to the hospital."

Defense

Defendant testified that sometime on the day of the shooting, Glaude called Woodson to ask about buying marijuana. Woodson and defendant met Glaude in a parking lot in Fairfield and Glaude followed them in his car to Buchanan's apartment. Defendant went into the apartment with Woodson and Glaude and waited as they talked, but he grew impatient and left after 10 or 15 minutes.

Defendant said he tried to drive to the freeway, but got lost and found himself back on Santa Clara Street driving in the wrong direction. He parked and walked back towards Buchanan's apartment via the rear driveway. As he turned the corner, he said, he stumbled into the middle of a robbery. Glaude was lying prone

on the ground and a man wearing some kind of white mask was standing over him holding a gun. Defendant froze. The masked man pointed the gun at him and started to approach. Defendant grabbed the gun and they wrestled. Glaude got up and came to defendant's assistance. The robber started shooting. Defendant managed to free himself from the robber's grasp, but more shots were fired as he ran up the stairs and he was hit in the hand.

Defendant fled along the north walkway and around the front of the building, and lost his T-shirt as he ran. He ran to his car and drove away. As he turned the corner he saw Woodson running and picked him up. Defendant testified that they drove to San Francisco rather than to a hospital in Vallejo because he was afraid the gunman might come after him to "finish [him] off, so I was trying to get as far as possible." He said he lied to the officers who questioned him in the emergency room because he was afraid of retribution from the assailants if he told the police about their operation.

The jury found defendant guilty of first degree murder and attempted robbery and found allegations of special circumstance felony murder and personal weapon use to be true. Woodson had been charged with the same offenses. The court declared a mistrial as to him because the jury was unable to reach a verdict. The court denied defendant's motion for a new trial and sentenced him to life in prison without parole and a consecutive term of 25 years to life in prison for the gun use enhancement. This appeal timely followed.

People v. Hughes, 2008 WL 3889946, at **1–3 (Cal. App. 1 Dist. August 22, 2008).

Petitioner appealed to the California Court of Appeal after his conviction and sentence. Resp't's Lod. Doc. 4.  The California Court of Appeal affirmed the judgment on August 22, 2008. See Hughes, 2008 WL 3889946, at *13.  Petitioner then filed a petition for review to the California Supreme Court.  Resp't's Lod. Doc. 8.  The Supreme Court summarily denied that petition without comment or citation by order dated December 10, 2008.  Resp't's Lod. Doc. 9.

On March 3, 2010, petitioner initiated this federal habeas corpus action.  ECF No. 1.  On September 30, 2011, while the case remained under submission, petitioner filed a motion for stay and abeyance to afford him an opportunity to exhaust his state judicial remedies with respect to newly-discovered claims.  ECF No. 23.  The newly-discovered claims were based on a post-conviction affidavit executed by Timothy Clay, a witness whose prior testimony was read to the jury at trial.  Id.  The court granted petitioner's motion for stay.  ECF No. 31.  Petitioner filed a habeas petition with the Solano County Superior Court, requesting an evidentiary hearing because his entitlement to relief depended on the credibility of Clay's declaration.  Resp't's Lod. Doc. No.

1    14 at 45–46.  The Solano County Superior Court denied the petition without holding an

2    evidentiary hearing finding that the Clay declaration lacked credibility.  ECF No. 54-1, at 15–16.

3    Subsequently, the Court of Appeal denied petitioner's second state habeas petition on the ground

4    that petitioner failed to include a copy of the superior court's order denying his petition for a writ

5    of habeas corpus.  Id. at 18.  The California Supreme Court denied petitioner's subsequent state

6    habeas petition without comment or citation.  Id. at 20.  On September 23, 2013, petitioner filed

7    his first amended petition and the Court subsequently lifted the stay.  ECF Nos. 54, 56.

8    Respondent filed an answer and petitioner filed a traverse.  ECF Nos. 64, 73.

9    *DISCUSSION*

10   I. AEDPA Standards

11        The statutory limitations of federal courts' power to issue habeas corpus relief for persons

12   in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

13   Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

14           An application for a writ of habeas corpus on behalf of a person in
15           custody pursuant to the judgment of a State court shall not be
             granted with respect to any claim that was adjudicated on the merits
16           in State court proceedings unless the adjudication of the claim-

17           (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established Federal law, as
18           determined by the Supreme Court of the United States; or

19           (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
20           State court proceeding.

21        As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

22   2254(d) does not require a state court to give reasons before its decision can be deemed to have

23   been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).  Rather,

24   "when a federal claim has been presented to a state court and the state court has denied relief, it

25   may be presumed that the state court adjudicated the claim on the merits in the absence of any

26   indication or state-law procedural principles to the contrary."  Id. at 784–785, citing Harris v.

27   Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when it

28   is unclear whether a decision appearing to rest on federal grounds was decided on another basis).

1    "The presumption may be overcome when there is reason to think some other explanation for the

2    state court's decision is more likely." Id. at 785.

3          The Supreme Court has set forth the operative standard for federal habeas review of state

4    court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

5    application of federal law is different from an incorrect application of federal law.'" Harrington,

6    supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000).

7    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

8    'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786,

9    citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

10         Accordingly, "a habeas court must determine what arguments or theories supported or . . .

11   could have supported[] the state court's decision; and then it must ask whether it is possible

12   fairminded jurists could disagree that those arguments or theories are inconsistent with the

13   holding in a prior decision of this Court." Id.  "Evaluating whether a rule application was

14   unreasonable requires considering the rule's specificity.  The more general the rule, the more

15   leeway courts have in reaching outcomes in case-by-case determinations.'" Id.  Emphasizing the

16   stringency of this standard, which "stops short of imposing a complete bar of federal court

17   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

18   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

19   was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

20         The undersigned also finds that the same deference is paid to the factual determinations of

21   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

22   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

23   decision that was based on an unreasonable determination of the facts in light of the evidence

24   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

25   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

26   factual error must be so apparent that "fairminded jurists" examining the same record could not

27   abide by the state court factual determination.   A petitioner must show clearly and convincingly

28   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

1 | 969, 974 (2006).

2 |      The habeas corpus petitioner bears the burden of demonstrating the objectively

3 | unreasonable nature of the state court decision in light of controlling Supreme Court authority.

4 | Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must

5 | show that the state court's ruling on the claim being presented in federal court was so lacking in

6 | justification that there was an error well understood and comprehended in existing law beyond

7 | any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–787. "Clearly

8 | established" law is law that has been "squarely addressed" by the United States Supreme Court.

9 | Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008). Thus, extrapolations of

10 | settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

11 | Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653–54 (2006) (established law not permitting state

12 | sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

13 | prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

14 | established law when spectators' conduct is the alleged cause of bias injection). The established

15 | Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

16 | controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

17 | federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

18 |      When a state court decision on a petitioner's claims rejects some claims but does not

19 | expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

20 | the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___, 133 S. Ct.

21 | 1088, 1091 (2013). However, if the state courts have simply not adjudicated the merits of the

22 | federal issue, no AEDPA deference is given; the issue is reviewed de novo under general

23 | principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

24 |      The state courts need not have cited to federal authority, or even have indicated awareness

25 | of federal authority in arriving at their decision. Early, 537 U.S. at 8, 123 S. Ct. at 365. Where

26 | the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

27 | federal court will independently review the record in adjudication of that issue. "Independent

28 | review of the record is not de novo review of the constitutional issue, but rather, the only method

1   by which we can determine whether a silent state court decision is objectively unreasonable."

2   Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

3   II.   Application of AEDPA to Petitioner's Claims

4           Petitioner contends that no AEDPA deference is due to the state court's rejection of his

5   claims because the decisions were based on an unreasonable determination of the facts in light of

6   the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d)(2).  There are two

7   ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th

8   Cir. 2012).  He may show the state court's findings of fact "were not supported by substantial

9   evidence in the state court record" or he may "challenge the fact-finding process itself on the

10  ground it was deficient in some material way."  Id. (citing Taylor v. Maddox, 366 F.3d 992, 999–

11  1001 (9th Cir. 2004).  The standard for determining whether the state court's fact finding process

12  is insufficient requires the federal court to "be satisfied that any appellate court to whom the

13  defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding

14  that the state court's fact-finding process was adequate."  Hibbler, 693 F.3d at 1146–47 (quoting

15  Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)).  The state court's failure to hold an

16  evidentiary hearing does not automatically render its fact finding process unreasonable.  Id. at

17  1147.  However, the Ninth Circuit has explained that federal standards for determining when an

18  evidentiary hearing is mandatory are a useful guide to determining the reasonableness of the state

19  court's refusal to hold a hearing:

20          A state court's decision not to hold an evidentiary hearing does not
            render its fact-finding process unreasonable so long as the state
21          court could have reasonably concluded that the evidence already
            adduced was sufficient to resolve the factual question. See Earp,
22          431 F.3d at 1170 (noting that a state court is not required to hold an
            evidentiary hearing when it is possible to resolve the factual
23          question "based on 'documentary testimony and evidence in the
            record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950
24          (9th Cir. 2006) (holding that it is reasonable for a state court to
            resolve a disputed factual question without an evidentiary hearing
25          when the petitioner's allegations are "incredible in light of the
            record, or . . . when the record already before the court is said to
26          establish a fact conclusively"). The ultimate issue is whether the
            state's fact-finding procedures were reasonable; this is a fact-bound
27          and case-specific inquiry.

28  /////

9

Because AEDPA does not provide any specific guidance on what sort of procedural deficiencies will render a state court's fact-finding unreasonable, we have sometimes turned for guidance to cases considering a similar issue in a different context: when a federal district court considering a habeas petition must or should conduct an evidentiary hearing. See Earp, 431 F.3d at 1166–67, 1169–70 (looking to Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts). In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474. More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. "'[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998)).

While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2) . . . . Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, see Landrigan, 550 U.S. at 474–75, we may not "second-guess a state court's fact-finding process" unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative: if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable.

Accordingly, in considering a petitioner's argument that the state court's failure to hold an evidentiary hearing rendered its factual findings unreasonable, we may first consider whether a similarly situated district court would have been required to hold an evidentiary hearing. See Earp, 431 F.3d at 1167. We begin with the rule that no such hearing is required "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at 950; see also Lambert, 393 F.3d at 965–66 (holding that an evidentiary hearing is not a prerequisite to an adjudication on the merits triggering AEDPA deference). The ultimate question, however, is whether an appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record. Taylor, 366 F.3d at 1000.

1    Hibbler, 693 F.3d at 1147–48.[2]

2          Petitioner first contends, insofar as Clay's unavailability is concerned, that the state

3    court's findings of fact were not supported by substantial evidence in the state appellate record,

4    and secondly contends the fact-finding process regarding the credibility of Timothy Clay's post-

5    trial affidavit was deficient in a material way.  Petitioner also adds for the first time in federal

6    court the declaration of Clay's mother on the topic of prosecutorial misconduct.

7          A. The State Court's Decision Based on the Appellate Record

8          Petitioner contends that the state court's decision upholding the trial court's finding that

9    Timothy Clay was unavailable is based on a mistaken reading of the appellate record and violates

10   federal law.

11         The Sixth Amendment provides that a criminal defendant has the right to confront the

12   witnesses against him.  See U.S. CONST. amend. VI.  This is a fundamental right which applies

13   to all out-of-court testimonial statements ("testimonial hearsay") offered for the truth of the

14   matter asserted.  See Crawford v. Washington, 541 U.S. 36, 68 (2004).  Testimonial hearsay is

15   inadmissible, unless (1) the witness is unavailable; and (2) the criminal defendant had an

16   opportunity to cross-examine the declarant at the action or proceeding where the testimony took

17   place.  See id.; Jackson v. Brown, 513 F.3d 1057, 1082-83 (9th Cir. 2008).  In Crawford, the

18   Supreme Court refused to spell out a comprehensive definition of what constitutes "testimonial,"

19   however, the Court explained that it applied "at a minimum to prior testimony at a preliminary

20   hearing, before a grand jury, or at a former trial; and to police interrogations."  541 U.S. at 68.

21   A witness is not unavailable for purposes of the exception to the Confrontation Clause "unless the

22   prosecutorial authorities have made a good-faith effort to obtain his presence at trial."

23   Barber v. Page, 390 U.S. 719, 725 (1968).  It is the prosecution's burden to demonstrate that it

24   took reasonable steps to secure the witness's presence at trial.  See Ohio v. Roberts, 448 U.S. 56,

25   [2] The undersigned is aware of Hurles v. Ryan, 752 F.3d 768 (9th Cir. 2014) (If a state court

26   makes factual findings without an opportunity for the petitioner to present evidence, the fact-
     finding process is deficient and the state court opinion is not entitled to deference.), petition for

27   cert. filed, 82 USLW 3009 (Jun. 17, 2013).  To the extent that Hurles imposes a per se bar to a
     state court's credibility finding without an evidentiary hearing, it is inconsistent with Hibbert (not

28   cited in the Hurles majority opinion); the undersigned will follow the earlier Ninth Circuit case.

1 │ 74-75 (1980), abrogated on other grounds by, Crawford, 541 U.S. 36.

2 │       The California Court of Appeal analyzed the prosecutor's due diligence in deciding

3 │ Petitioner's Confrontation Clause claim on direct appeal as follows:

> As explained by our Supreme Court, "A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. [Citations.] The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must 'have made a good-faith effort to obtain his presence at trial.' [Citations.] The California Evidence Code contains a similar requirement. As relevant, it provides that to establish unavailability, the proponent of the evidence, here the prosecution, must establish that the witness is absent from the hearing and either that 'the court is unable to compel his or her attendance by its process' [citation] or that the proponent 'has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process' [Citation]. The constitutional and statutory requirements are 'in harmony.'" (People v. Smith (2003) 30 Cal.4th 581, 609; see also People v. Cromer (2001) 24 Cal.4th 889, 896-897; Evid.Code, §§ 1291, subd. (a)(2), 240, subd. (a)(5).)
>
> The diligence required is "'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.'" (People v. Cromer, supra, 24 Cal.4th at p. 904.) On the other hand, although the prosecution must take reasonable steps to locate an absent witness, it "need not do 'a futile act.'" (People v. Smith, supra, 30 Cal.4th at p. 611.) We independently review the trial court's determination that the prosecution's efforts to locate an absent witness are sufficient to justify an exception to the defendant's right of confrontation. (Cromer, at p. 901.)
>
> Here, our independent review satisfies us that the evidence supports the court's determination. The court held an evidentiary hearing on the due diligence issue. Solano County District Attorney's Investigator Arthur Gerrans testified about his efforts over the course of 18 months to find and serve Clay for various court dates leading up to and including the trial. Gerrans first attempted to find and serve Clay in September 2004, for the November 2004 preliminary hearing. At that time he had a listing for Clay's address at his mother's home at 6 Tolentino Drive. Gerrans went there several times but found no one home. He left a business card, but was not contacted. He tried Clay's cell phone number and found it was no longer in service.

27 │ /////

28 │ /////

On October 1, 2004, Gerrans called the home number at 6 Tolentino Drive and spoke to Clay's mother, Ketora Clay. Ms. Clay told him her son still lived there, but that he did not want to talk to the police or be involved in the trial. She agreed to help Gerrans, and with her assistance Gerrans was able to serve Clay at the Tolentino Drive address on October 5, 2004.

Clay appeared and testified at the preliminary hearing and a second preliminary hearing on December 10, 2004. The trial date was scheduled for May 23, 2005, and then reset for July 18, 2005, and again for February 27, 2006. While it is unnecessary to exhaustively recount Gerrans's numerous different attempts to locate and serve Clay for these trial dates, we note that he made 23 attempts for the May 23, 2005, date before he successfully served Clay; he then made 11 attempts to serve Clay for the July 18, 2005, date before he was able, again with Ms. Clay's intervention, to arrange a meeting and serve Clay with a subpoena; and then he made another 23 attempts before he managed to effect service for the February 27, 2006, trial date. The majority of these attempts involved visiting and calling Ms. Clay at the Tolentino Street address. Gerrans also ran a criminal history check on Clay, checked Department of Motor Vehicles (DMV) records and other information from the Vallejo Police Department, ran a Solano County public records check, gave a subpoena to Detective Reynolds with the Vallejo Police Department, contacted Clay's former employer, United Parcel Service (UPS), for current information, and ran Clay's information through the district attorney's "Crimes" database and county welfare records. He did not check postal records because Ms. Clay had told him that Clay moved out of his parents' house and was transient and staying with various friends while "on the run."

The trial was ultimately reset for April 10, 2006. Gerrans made 39 more attempts to serve Clay, but was ultimately unsuccessful. On January 11, 2006, he discovered that Clay had been cited on July 22, 2005, for false impersonation and driving on a suspended license. Gerrans checked the district attorney's database but found no information about any court appearances on Clay's citation. After the trial date was continued until April, he investigated further and learned that Clay had a court date scheduled for March 10, 2006. Gerrans attended the hearing but Clay failed to appear. Gerrans put a hold on Clay's file and requested to be notified if Clay were to be rearrested. He also examined Clay's citation and reviewed the court file for any new contact information, but there was none.

Gerrans returned to the UPS facility to ascertain whether Clay had resumed his former job or had provided UPS with new contact information, also to no avail. An updated DMV records check on January 11, 2006, still showed Clay had a suspended license and lived at the Tolentino address. A check of county welfare records also produced no new information.

/////

13

Gerrans met with Clay's parents at their home on February 25 or February 26. Clay's father knew nothing about his son's whereabouts, and both parents were upset by Clay's failure to keep in contact with them. Ms. Clay said that Clay would drop by on occasion, but she had no phone number or address for him. She said that at one point she knew Clay had been staying with a girlfriend, but she refused to give Gerrans the girl's name or phone number. She explained that Clay was transient and staying with "all kinds of different girls and different people." Investigator Gerrans last spoke with Ms. Clay on April 7, 2006, the Friday before trial began. She promised to call Gerrans if her son contacted her over the weekend.

The court found that Gerrans exercised due diligence in his efforts to find Clay. It explained that "defendants are entitled to a fair trial, not a perfect one, and as a taxpayer in this county, you know, I, like everybody else, hope that our law enforcement agencies that we pay for do[ing] a good job and that we get a dollar's worth of work for a dollar's worth of our taxpayers' dollars. And I think that although the efforts in this case may not have been perfect, and it appears they were not successful, that extreme due diligence was exercised...." We agree. The record reflects diligent and prolonged efforts to locate and serve Clay to compel his attendance at trial, starting in September 2004 and continuing intermittently until the trial began in April 2006. Although defendant criticizes Investigator Gerran's efforts to find Clay at his mother's home as "geared toward finding him at a place where for at least a year or longer he knew that Clay would not be located," the criticism falls wide of the mark. Ketora Clay was Gerran's strongest connection to Clay, and his painstaking cultivation of that connection, with some success, was the most likely means for Gerrans to contact and serve Clay. It was eminently reasonable to pursue that avenue of investigation.

This is a far cry from the situation in Cromer on which defendant relies. The prosecution there knew that a witness disappeared in June 1997, but made no serious effort to locate her until a month before trial in December 1997. Even then, the prosecution's investigators' only efforts were to visit the witness's former address five or six times after being told she no longer lived there. Two days before trial they were told the witness was staying at her mother's house, but they delayed going to the mother's house for another two days. When they finally did, a woman told them the mother would be gone until the following day and that the witness did not live there. The investigators left a subpoena for the witness but did not return the next day or attempt to contact the mother by other means. (People v. Cromer, supra, 24 Cal.4th at pp. 903-904.)

Here, the prosecution began its investigation early and renewed efforts to locate Clay over a period of some 18 months each time the trial date was reset. Gerrans made numerous visits to Clay's mother because she was his best link to Clay, and was willing to help the prosecution contact her son. Gerrans also contacted Clay's former employer more than once, searched criminal and welfare databases, and attempted to serve Clay at a hearing in a different matter. No similar effort was shown in Cromer.

14

While it is true that Gerrans could have pursued additional avenues of investigation-defendant specifically faults him for failing to search postal records and pursue potential leads from a civil paternity case against Clay-there is no indication that these efforts would have borne fruit. [N.2] In any event, "[d]efendant's contention that the People should have done more ... is irrelevant to our analysis. 'That additional efforts might have been made or other lines of inquiry pursued does not affect [our] conclusion.... It is enough that the People used reasonable efforts to locate the witness.'" (<u>People v. Wise</u> (1994) 25 Cal .App.4th 339, 344; <u>see also</u> <u>People v. Guiterrez</u> (1991) 232 Cal.App.3d 1624, 1641 [the prosecution "need not exhaust every potential avenue of investigation to satisfy its obligation to use due diligence ...."], disapproved on another point in <u>People v. Cromer</u>, <u>supra</u>, 24 Cal.4th at p. 901, fn. 3.) Diligence, not perfection, is the required standard. We agree with the trial court that the prosecution's efforts demonstrate due diligence.

> [N.2] Defendant also complains that Gerrans could have tried to serve Clay at three prior court dates in other cases, but overlooks that those dates were all well before the February 26, 2006, trial date for which Gerrans had successfully located and served Clay.

<u>Hughes</u>, 2008 WL 3889946 at **5-8.

In <u>Hardy v. Cross</u>, the Supreme Court stated that, under AEDPA, a federal court may not overturn a state's decision on unavailability simply because the federal court would have required the State to do more:

> As we observed in <u>Roberts</u>, when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, see 448 U.S. at 75, 100 S.Ct. 2531, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry no matter how unpromising. And, more to the point, the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.

132 S. Ct. 490, 495 (2011).

Petitioner contends that footnote two of the California Court of Appeal's opinion was a mistaken view of the facts and thus, the state court's decision was based on an unreasonable determination of the facts. The footnote states that Gerrans successfully served Clay for the February 26, 2006 trial date. The court has previously found that the "record is at best unclear regarding whether the prosecutor was successful in serving Clay with a subpoena after May

15

1    2005." ECF No. 30, at 14–15.

2         However, as respondent asserts, the footnote was presented as an after-thought by the

3    court and thus was not material to its conclusion that the State had been diligent in attempt to

4    serve Timothy Clay. Hughes, 2008 WL 3889946 at *8. The text preceding this footnote

5    dismissed petitioner's suggestion that the district attorney should have done more. Id. The state

6    court's decision relied upon the state's "diligent and prolonged efforts to locate and serve Clay to

7    compel his attendance at trial, starting in September 2004 and continuing intermittently until the

8    trial began in April 2006." Id. at *7. As noted above, a federal court may not overturn the state

9    court's decision on unavailability merely because it identifies additional steps that could have

10   been taken. Hardy, 132 S. Ct. at 495. Accordingly, the state court's decision rejecting

11   petitioner's Sixth Amendment claim based on unavailability was not based on a mistaken reading

12   of the state court record.

13        B. The State Court's Credibility Determination of Timothy Clay

14        During the pendency of the instant action, petitioner received an affidavit signed by

15   Timothy Clay and notarized. ECF No. 23 at 3–4. The affidavit explained that Clay had lied

16   when he was interviewed by the police shortly after the shooting occurred and that District

17   Attorney Investigator Gerrans instructed him that Clay would not attend or testify at trial, that he

18   should leave the county for a month or so, and that he should stay out of trouble. Resp't's Lod.

19   Doc. No. 10 at 14. The court granted petitioner's request to stay the federal habeas petition so

20   that he could exhaust his newly-discovered claims based on the Clay affidavit. ECF No. 30 at 15.

21   Petitioner filed a habeas petition with the Solano County Superior Court, requesting an

22   evidentiary hearing because his entitlement to relief depended on Clay's credibility. Resp't's

23   Lod. Doc. No. 14 at 45–46.[3]   In denying petitioner's state superior court habeas petition, the

24   Solano Superior Court concluded as follows:

25   /////

26

---

27   [3] The court does not have copies of petitioner's state superior court habeas petition. Respondent
     has only lodged a copy of petitioner's habeas petition to the California Supreme Court which
28   appears to be a reiteration of petitioner's state superior court habeas petition.

1
2
3
4
5
6
7

On April 2, 2012, Petitioner Deangeleo Hughes filed this petition for writ of habeas corpus.  Petitioner seeks to overturn his criminal conviction in case number VCR174438 based on newly discovered evidence.   Namely, Petitioner presents an affidavit allegedly authored by Timothy Clay, who testified as a witness at Petitioner's preliminary hearing and whose testimony was introduced at Petitioner's trial, in which Mr. Clay states that he saw another man commit the crimes Petitioner was convicted of.   Mr. Clay also asserts that he lied to police about seeing Petitioner commit the crime because he was jealous of Petitioner's relationship with a woman, Petitioner paid him $500.00 to recant statements inculpating Petitioner at the preliminary hearing, and the D.A.'s investigator instructed Mr. Clay to leave the county so that he would be unavailable at trial.

8
9
10
11
12

Petitioner fails to state a prima facie case for relief with regard to this newly discovered evidence claim.  (People v. Duvall (1995) 9 Cal.4th 464, 475.)  The affiant here, Mr. Clay, lacks credibility.  (In re Weber (1974) 11 Cal.3d 703, 723-25; In re Hall (1981) 30 Cal.3d 408, 418.)  Considering Mr. Clay's lack of credibility, Petitioner has failed to show entitlement to relief on his claim of actual innocence.   (In re Lawley (2008) 42. Cal.4th 1231, 1239 & 1245-46; People v. Gonzalez (1990) 51 Cal.3d 1179, 1246.)

13   ECF No. 54-1, at 15–16.

14      Petitioner contends that the state court's failure to conduct an evidentiary hearing on the

15   credibility of Timothy Clay (ECF No. 23, at 7–24) rendered its decision on petitioner's state court

16   habeas petition an unreasonable determination of the facts.  Petitioner's claim here is somewhat

17   unusual in that the prior testimony given by Clay, subject to cross-examination at the preliminary

18   hearing, was favorable to petitioner.  It was only the unsworn statement given by Clay to the

19   police officer (the second rendition of the facts), used to impeach Clay's testimony, which

20   inculpated petitioner.  But the detective witness who actually presented Clay's interrogation

21   statement was subject to cross-examination at trial.  Thus in terms of harmfulness, Clay's actual

22   testimony at preliminary hearing, while not affirmatively exonerating petitioner, was not harmful

23   in the least except insofar as he was impeached.  In fact, if petitioner's more recent statements are

24   to be believed, he was pleased with Clay's preliminary hearing testimony.

25      Petitioner has filed a new Clay declaration in federal court (ECF No. 54-1, Ex. F),

26   removing, as petitioner's counsel asserts, immaterial matter, making the declaration easier to

27   read.  Filed for the first time is a declaration by Clay's mother (ECF No. 54-1, Ex. G.) attesting to

28   facts regarding whether Clay was dissuaded from testifying by the prosecution's investigator.

17

1    The first topic of discussion is what declaration(s) may be reviewed here.

2              For reasons set forth at length below, the recent federal court Clay declaration is much

3    more than a mere grammatical reformulation or deletion of truly irrelevant matters.  Rather the

4    credibility- bursting Clay statements in the declaration before the state court (ECF No. 23, at 7–

5    24)[4] on exhaustion have been deleted.  Clay's bizarre statements concerning the why's and

6    wherefore's of his actions, and his complete obliviousness to the need to testify truthfully,

7    reflected in the  statements which have been sanitized from his recent federal declaration, are the

8    very statements which would lead a state judge to opine that the declaration lacks credibility on

9    its face.  Moreover, the recent federal declaration was not before the state court; there is no need

10   to review anything else but the declaration before the state court however phrased.

11             Of course, Clay's mother's declaration was not before the state court in any fashion.  As

12   held by <u>Cullen v. Pinholster</u>, __U.S. __, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011), only

13   those evidentiary submissions which were before the state court can be determinative of whether

14   the state court acted AEDPA unreasonably.  Even if Clay's mother's declaration could be

15   considered, it conflicts with the Clay declaration in fundamental ways.  Whether the investigator

16   affirmatively told Clay to "get lost during petitioner's trial" *in the physical presence of Clay and*

17   *his mother* (ECF No. 54-1, Ex. G [Ketora Clay's version]), or to Clay *only by telephone* (ECF No.

18   54-1, Ex. F [Timothy Clay's version]), is much more than a mere detail on which otherwise

19   truthful witnesses sometimes disagree.  Rather, it bespeaks the flippant manner in which the truth

20   has been treated in this habeas action by the percipient actors.[5]  Accordingly, only the Clay

21   declaration presented to the state courts on exhaustion will be reviewed in detail here.  ECF No.

22   23, at 7–24.

23             Respondent has exhaustively detailed the reasons why the infrequent exception to making

24   a credibility analysis on the papers applies here.  Certainly, the state courts cannot be found

25   AEDPA unreasonable in determining the lack of credibility on the face of Clay's declarations.

---

26   [4] The parties do not dispute that the Clay declaration, ECF 23, presented with the Motion to Stay,
27   was the declaration presented to the state courts.

28   [5] None of the court's observations are intended to reflect on petitioner's counsel.

1    The undersigned highlights below the especially pertinent facts.

2        As an initial matter, it is worth noting that recantations of given testimony are highly

3    disfavored.  Indeed, the Ninth Circuit has adopted a characterization that a recantation "usually

4    isn't worth the time it takes to prepare."  Carriger v. Stewart, 132 F.3d 463, 483 n.1 (9th Cir.

5    1997).  Clay's declaration/recantation is an example of why the Ninth Circuit adopts this view.

6        The most salient feature concerning Clay's lack of credibility was the many stories he

7    made up about the pertinent events for various personal purposes with complete disregard for the

8    truth.  He even testified falsely, he admits, under penalty of perjury at the preliminary

9    examination.

10        First, Clay asserts that he was jealous of petitioner because he coveted a girlfriend of

11    petitioner, at least thought by Clay to be a girlfriend.  Clay then made a plan to inculpate

12    petitioner with the ostensible purpose of then swooping in for his catch.

13        Then, despite his knowledge that petitioner Hughes was in custody, he formulates his next

14    plan to await the announcement of an award from the police, after which he will then ostensibly

15    relate the true facts presumably inculpating petitioner again.  The court finds two possible

16    inferences to be drawn by this plan, both of which do not inure to a finding of Clay's good

17    credibility: (1) Clay is fabricating this mind-set; or (2) he really is so oblivious to the criminal

18    justice system that he believes the authorities will pay for testimony from a percipient witness (as

19    opposed to paying an award which will led to the capture of a suspect).

20        However, when first questioned by the police, he apparently forgot all about the plans he

21    had just made, and related that he had not seen anything.  Clay asserts that he was "surprised" by

22    the police appearance at his place of work despite his formulated plan.  However, when pressed

23    by the police questioners because they did not believe his first story, Clay then manages to get it

24    all together, and relates that petitioner was the assailant.

25        Clay nevertheless waits and waits, and avoids attempts by law enforcement to contact

26    him, despite being interested in any reward.  The bizarre series of events continues.  Clay finally

27    realizes that no reward will be offered, but inconsistently hopes that the case will be dismissed.

28    Next, petitioner, still in custody and awaiting preliminary hearing, now contacts Clay with an

19

1   offer to pay for favorable testimony.  This request to obstruct justice and commit perjury is then

2   amazingly reduced to a contractual writing which is given to Clay by petitioner's girlfriend.  Clay

3   accepts the offer.  The agreement to commit perjury, somehow of a higher obligation than to

4   testify truthfully while under oath, is now the plan.

5       Clay is finally served with a subpoena to attend the preliminary hearing; however, he

6   testifies (again and inconsistently with his inculpatory second story given to the police) that he

7   did not see the events of the robbery/murder.  Clay is impeached with his inculpatory statement to

8   the police.  Because Clay did not completely exonerate petitioner, *i.e.*, identify someone else as

9   the culprit, and because petitioner's case will move forward towards trial, Clay becomes worried

10  that petitioner will be angry with him.  Such is not the case.  Petitioner purportedly gives Clay

11  praise for his preliminary hearing testimony.  The deal is still on.

12       Nevertheless, Clay now "remembers" that his original plan was not to enrich himself with

13  whatever version of the facts would satisfy the paying party, but rather to inculpate petitioner so

14  that he could move in on petitioner's girlfriend, or at least the person Clay perceives as

15  petitioner's girlfriend.  He resolves to go back to his original plan, but inconsistently with his

16  recommitted purpose, avoids the prosecution and the very proceeding which would bring finality

17  to the plan.  He allegedly makes himself scarce because the prosecution's investigator, either by

18  direct telephone call to Clay, or in person along with Clay's mother, tells him his testimony is not

19  necessary, and to leave the county, for however long it takes for petitioner's trial to be over.

20  More will be said about this claim of prosecution misconduct below.  Clay, of course, obliges the

21  prosecution's desires, and avoids the trial which would successfully bring to fruition any of his

22  formulated plans.

23       Petitioner is convicted, based in part, on the preliminary hearing impeachment of Clay

24  given at the preliminary hearing, and at trial.  Years pass.  Clay finally sees the light of truth

25  based on his changed familial status and his desire to right a wrong.  The first, unsanitized

26  declaration given for petitioner's habeas proceeding is then written, but not by Clay.  Because

27  Clay asserts grammatical and writing insufficiencies, he pours out his "final" story on an impulse

28  to a complete stranger at a coffee shop.  This person then gives Clay the final product which

accounts for important evidence presented at the trial Clay avoided (but somehow Clay knows), most importantly, the DNA evidence tying petitioner to the shirt worn and used by the assailant. Not surprisingly, Clay is unwilling or unable to identify this scrivener, a person learned in the law who performed this service for Clay and then vanished.

Just to recite the back and forth of Clay's first habeas declaration is to recognize the utter disingenuousness of the entire declaration, including the most recent "another guy did it" rendition. Clay's credibility has been so irreparably damaged, no credence could be placed on his exculpatory version. While what is really motivating the present assertion that petitioner did not commit the crime will probably never be clear, in light of the entirety of the declaration, a reasonable fact finder could not find the most recent Clay version credible.

As has been referenced above, Clay's first habeas declaration is being used to show prosecutorial misconduct as well as petitioner's innocence. Again, a witness is not unavailable for purposes of the exception to the Confrontation Clause "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber, 390 U.S.at 725. Affirmatively dissuading a witness from testifying at trial is the opposite of making a good-faith effort to obtain that witness's presence. As such, if a reasonable fact finder could determine any shred of truth in the Clay declaration, the facts alleged by petitioner would present a colorable claim for relief that the state court's finding on Clay's unavailability was unreasonable.

Clay asserts that the prosecution's investigator disappointed him by telling Clay that his testimony was not needed and that he was to leave the county so he could not be found for service of trial subpoena. However, the credibility of these assertions regarding misconduct are not immune from the taint imposed by the "petitioner did commit/did not commit the crime" assertions. The old maxim, *falsus in uno, falsus in omnibus* (false in one, false in all) is even more applicable as Clay's various stories and motivations have been found false more than once in many respects.

/////

/////

/////

1    Moreover, we are to believe by Clay's latter-day assertion that based just on the say-so of

2    the district attorney's investigator: he left his work, or made his presence at work more difficult,

3    divorced himself from his community, left his place of abode, etc., and despite his "contractual

4    obligation" with petitioner, or his on again-off again counter-desire to harm petitioner, gave up on

5    giving testimony.  And this request/directive was undertaken by Clay with absolutely no

6    recompense or other benefit or stated, explicit threat—and this from a person who often or always

7    asked initially—what's in it for me.  The adjudicator is asked to believe that on this one occasion,

8    Clay, who was not known for his ability to conform his conduct to the law or relate consistent

9    facts, just did what he was told to do.  That is difficult to believe.

10    Importantly and finally, the prosecution would have no real reason to desire Clay not to

11    appear at trial.  Assuming that Clay would try to exonerate petitioner, or at least again profess

12    ignorance of the facts, he could be impeached with his inculpatory statements despite his physical

13    presence.  Most prosecutors would relish the opportunity to impeach Clay in person as opposed to

14    on paper alone.  And this impeachment would be made in light of the other evidence linking

15    petitioner to the crime—especially the bloody white shirt.

16    In sum, Clay's assertion of facts constituting prosecutorial misconduct could be found

17    incredible by a reasonable trier of fact without an evidentiary hearing.

18    *CONCLUSION*

19    For all the foregoing reasons, petitioner has not satisfied the requirements for holding an

20    evidentiary hearing in this federal habeas action.  Accordingly, IT IS HEREBY ORDERED that:

21    Petitioner's request for an evidentiary hearing is denied.

22    Dated: December 16, 2014

23                                                    /s/ Gregory G. Hollows

24                                                    UNITED STATES MAGISTRATE JUDGE

25

26    GGH:016/Hugh3024

27

28

                                                    22