UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEANGELEO ANTOINE HUGHES,<br><br>    Petitioner,<br><br>    v.<br><br>JAMES WALKER,<br><br>    Respondent. | No. 2:10-cv-03024-WBS-GGH<br><br>FINDINGS AND RECOMMENDATIONS |

INTRODUCTION AND SUMMARY

    Petitioner is a state prisoner proceeding, through counsel, with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. A jury found petitioner guilty of first degree murder and attempted robbery and found true sentencing enhancements of felony murder and personal use of a firearm. Petitioner challenges his conviction and sentence on the following grounds: 1) Confrontation Clause violation by the introduction of prior testimony by Timothy Clay; and 2) prosecutorial misconduct by persuading a witness in the case not to appear at trial.

    On December 17, 2014, the court issued an order denying petitioner's request for an evidentiary hearing to determine the credibility of Timothy Clay as it relates to petitioner's claims. ECF No. 74. This order was affirmed by the District Judge, the Honorable William B. Shubb, on February 23, 2015, ECF No. 78. That determination having been made, the undersigned turns to the merits of petitioner's claims. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

BACKGROUND

The facts have been repeated frequently throughout the course of this case. For completeness, the undersigned includes the California Court of Appeal for the Third Appellate District's description below:

> BACKGROUND
>
> *The Crime*
>
> Defendant and his friend Jamar Woodson agreed to help Woodson's cousin, Alexander Glaude, find someone to sell him marijuana. Glaude followed defendant and Woodson as they drove from Fairfield to the apartment of O'Brian Buchanan at 1718 Santa Clara Street in Vallejo.
>
> Buchanan lived on the ground floor of a two-story apartment building and a stairway to the second floor units was just outside his apartment door. A walkway along the north side of the building leads to a rear parking lot.
>
> Glaude arrived there carrying $1,753 in cash between 11 p.m. and midnight with his girlfriend, Lynesse Hamilton. He parked in the rear parking lot, told Hamilton he would return soon, and went inside. He returned about 15 minutes later and moved the car to a spot on Santa Clara Street, across from the apartment building. He left Hamilton waiting in the car with the engine running and returned to Buchanan's apartment.
>
> Sometime later Hamilton noticed a man standing near the corner of Buchanan's apartment with a white shirt or towel covering his face. She thought he had a gun because of the way he was holding his hands, but she did not see any weapon. The man was of a medium build and dark complected or wearing a dark shirt. Glaude emerged from the apartment about 15 feet from where the man was standing and tussled with someone near the front of the building. Hamilton heard gunshots and was frightened. She ducked and then moved the car onto the street. As she did so she heard more gunshots. When Glaude did not appear after a couple of minutes, she drove to the next block and asked a woman to call 911.
>
> Eileen Vargas lived on the second floor in Buchannan's apartment building. Shortly after midnight she heard men arguing in the stairwell area about "weed," followed quickly by gunshots. She heard a muffled voice say "Don't look at my face" and "Do you want me to uncover my face?" Then the voice said "Get down on the ground" and demanded "Where's the money? and "Where's the shit?" After that she heard two series of gunshots that totaled about six shots. The first series of shots came from the front corner area of the building at the bottom of the stairs. The second series sounded like it came from the back of the building. Then she heard someone say "I've been shot in the hand."

2

Jerry Rozewski lived across the street from Buchanan's apartment complex. Shortly after midnight he also heard gunshots coming from the apartment. From his window he saw a man holding his left arm leave the apartment complex and get in the back seat of a car facing the wrong way on Santa Clara Street. Rozewski was unable to get a good view, but he could see that the man was an adult African-American with probably a shaved head.

Timothy Clay was 19 years old at the preliminary hearing. He was playing video games with four or five friends in Buchanan's apartment the night of the shooting, when Woodson (known as "Mar") and defendant (known as "Turtle," "Wax," or "Turtle Wax") arrived. Woodson and defendant kept entering and leaving the apartment. Their behavior made Clay nervous, so he left. He walked out to the front of the apartment complex and tried to call his friend Alton, who was still inside.

Detective Robert Reynolds interviewed Clay two days after the shooting. Reynolds testified that Clay initially denied that he witnessed the shooting and claimed he was inside the apartment at the time, but after further questioning Clay acknowledged that he was outside at the time, and he identified defendant as the shooter. He was in front of the apartment when he saw a man with a white shirt or cloth covering his face. He described the man as about six feet tall and weighing 220 to 230 pounds. The assailant was holding a gun in each hand and ordered Glaude and Woodson to lie on the ground. They complied at first, but then Glaude got up and fled. Defendant fired three shots. He hit Glaude at least once and shot himself in the hand. Glaude went down, but when defendant dropped one of his guns Glaude got up and fled down the walkway toward the back parking lot. Defendant picked up his gun and fired two or three more shots at Glaude. Then, defendant and Woodson ran across Santa Clara Street and got in a car.

Over defense objections, Clay was declared an unavailable witness and his preliminary hearing testimony was read to the jury. In the preliminary hearing Clay denied that he saw the shooting and was questioned about the statements he made to Detective Reynolds two days after the shooting. He disavowed his earlier statement to Detective Reynolds, and claimed he was merely repeating what Buchanan had told him might have happened. The prosecution impeached Clay's recantation with his prior statement to the detective.

After the shooting defendant and Woodson drove from Vallejo to San Francisco General Hospital to get defendant's hand treated. An emergency room surveillance tape showed that defendant arrived not wearing a shirt. When he was questioned by police in the emergency room, defendant said he had been robbed and shot in West Point. When officers went to West Point they found no evidence of a crime.

///

///

3

*The Investigation*

Vallejo Police Corporal Steve Darden arrived at the scene at 12:16 a.m. shortly after the shooting. Glaude was lying in shrubbery in the back of the complex. He had been shot and was in bad condition. Darden saw two distinct trails of blood leading from the area of the shooting, one led down the stairwell along the northeast side of the complex to where Glaude was laying in the bushes. The other went the opposite direction, to the spot on Santa Clara Street, where the injured shooter got in a car.

Several bullet fragments and two spent casings were found in the stairway area next to the entrance to Buchanan's apartment. Three more casings and additional bullet fragments were found near the driveway. Defendant's white T-shirt was in the stairwell with a bullet fragment on top of it.

DNA testing confirmed that blood on the T-shirt was defendant's. [N.1] His blood was also found in samples from both blood trails, indicating that defendant pursued Glaude down the north walkway to the parking lot before he fled south along the street to his car.

> [N1] The genetic profile in the bloodstain would be expected to occur in only one in 433 quadrillion African-Americans.

A forensic pathologist testified that Glaude was shot four times: once through his right hand, twice in the front of his left thigh, and once in the center of his back. His hand was shot from a distance of a few inches, and the lethal wound to his back was fired from approximately one to two feet away.

Cell phone records showed defendant called Woodson around five minutes before the murder. In the four hours before the murder, Woodson called Glaude's cell phone 15 times. The final call was 10 minutes before the murder.

After he was arrested, defendant told his girl-friend in a telephone call from jail: "Hey, you know, where I fucked up at? [¶] ... [¶] Going to the hospital."

*Defense*

Defendant testified that sometime on the day of the shooting, Glaude called Woodson to ask about buying marijuana. Woodson and defendant met Glaude in a parking lot in Fairfield and Glaude followed them in his car to Buchanan's apartment. Defendant went into the apartment with Woodson and Glaude and waited as they talked, but he grew impatient and left after 10 or 15 minutes.

///

///

///

4

> Defendant said he tried to drive to the freeway, but got lost and found himself back on Santa Clara Street driving in the wrong direction. He parked and walked back towards Buchanan's apartment via the rear driveway. As he turned the corner, he said, he stumbled into the middle of a robbery. Glaude was lying prone on the ground and a man wearing some kind of white mask was standing over him holding a gun. Defendant froze. The masked man pointed the gun at him and started to approach. Defendant grabbed the gun and they wrestled. Glaude got up and came to defendant's assistance. The robber started shooting. Defendant managed to free himself from the robber's grasp, but more shots were fired as he ran up the stairs and he was hit in the hand.
>
> Defendant fled along the north walkway and around the front of the building, and lost his T-shirt as he ran. He ran to his car and drove away. As he turned the corner he saw Woodson running and picked him up. Defendant testified that they drove to San Francisco rather than to a hospital in Vallejo because he was afraid the gunman might come after him to "finish [him] off, so I was trying to get as far as possible." He said he lied to the officers who questioned him in the emergency room because he was afraid of retribution from the assailants if he told the police about their operation.
>
> The jury found defendant guilty of first degree murder and attempted robbery and found allegations of special circumstance felony murder and personal weapon use to be true. Woodson had been charged with the same offenses. The court declared a mistrial as to him because the jury was unable to reach a verdict. The court denied defendant's motion for a new trial and sentenced him to life in prison without parole and a consecutive term of 25 years to life in prison for the gun use enhancement. This appeal timely followed.

People v. Hughes, 2008 WL 3889946, at **1-3 (Cal. App. 1 Dist. August 22, 2008).

PROCEDURAL HISTORY

Petitioner appealed to the California Court of Appeal after his conviction and sentence. Resp't's Lod. Doc. 4. The California Court of Appeal affirmed the judgment on August 22, 2008. See Hughes, 2008 WL 3889946, at *13. Petitioner then filed a petition for review to the California Supreme Court. Resp't's Lod. Doc. 8. The Supreme Court summarily denied that petition without comment or citation by order dated December 10, 2008. Resp't's Lod. Doc. 9.

On March 3, 2010, petitioner initiated this federal habeas corpus action. ECF No. 1. On September 30, 2011, while the case remained under submission, petitioner filed a motion for stay and abeyance to afford him an opportunity to exhaust his state judicial remedies with respect to newly-discovered claims. ECF No. 23. The newly-discovered claims were based on a post-conviction affidavit executed by Timothy Clay. Id. The court granted petitioner's motion for

stay. ECF No. 31. On September 23, 2013, petitioner filed his first amended petition and the Court subsequently lifted stay. ECF Nos. 54, 56. Respondent filed an answer and petitioner filed a traverse. ECF Nos. 64, 73. In that traverse, petitioner abandoned his previously stated third claim that the prosecutor's final argument exhibited prosecutorial misconduct. Thus, only the two issues set forth below are finally discussed here.

DISCUSSION

I. AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S.Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

/ / /

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – *i.e.*, the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively

unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786-787. "Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

When a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___, 133 S.Ct. 1088, 1091 (2013). However, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early, 537 U.S. at 8, 123 S.Ct. at 365. Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

II. Confrontation Clause

Petitioner contends (1) the state court's decision upholding the trial court's introduction of prior testimonial statements made by Timothy Clay was an unreasonable application of clearly-established federal law; and (2) that decision was also based on an unreasonable determination of the facts.

    A.  Application of Clearly Established Federal Law

Petitioner asserts that the introduction of prior testimonial statements made by Timothy Clay deprived petitioner of the rights to confrontation and cross-examination guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. The Sixth Amendment provides that a criminal defendant has the right to confront the witnesses against him. See U.S. CONST. amend. VI. This is a fundamental right which applies to all out-of-court testimonial statements ("testimonial hearsay") offered for the truth of the matter asserted. See Crawford v. Washington, 541 U.S. 36, 68 (2004). Testimonial hearsay is inadmissible, unless (1) the witness is unavailable; and (2) the criminal defendant had an opportunity to cross-examine the declarant at the action or proceeding where the testimony took place. See id.; Jackson v. Brown, 513 F.3d 1057, 1082–83 (9th Cir. 2008). In Crawford, the Supreme Court refused to spell out a comprehensive definition of what constitutes "testimonial," however, the Court explained that it applied "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68.

A witness is not unavailable for purposes of the exception to the Confrontation Clause "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber v. Page, 390 U.S. 719, 725 (1968). It is the prosecution's burden to demonstrate that it took reasonable steps to secure the witness's presence at trial. See Ohio v. Roberts, 448 U.S. 56, 74–75 (1980), abrogated on other grounds by, Crawford, 541 U.S. 36.

The California Court of Appeal analyzed the prosecutor's due diligence in deciding Petitioner's Confrontation Clause claim on direct appeal as follows:

> As explained by our Supreme Court, "A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a

9

previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. [Citations.] The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must 'have made a good-faith effort to obtain his presence at trial.' [Citations.] The California Evidence Code contains a similar requirement. As relevant, it provides that to establish unavailability, the proponent of the evidence, here the prosecution, must establish that the witness is absent from the hearing and either that 'the court is unable to compel his or her attendance by its process' [citation] or that the proponent 'has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process' [Citation]. The constitutional and statutory requirements are 'in harmony.'" (*People v. Smith* (2003) 30 Cal.4th 581, 609; *see also People v. Cromer* (2001) 24 Cal.4th 889, 896-897; Evid.Code, §§ 1291, subd. (a)(2), 240, subd. (a)(5).)

The diligence required is "'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.'" (*People v. Cromer*, *supra*, 24 Cal.4th at p. 904.) On the other hand, although the prosecution must take reasonable steps to locate an absent witness, it "need not do 'a futile act.'" (*People v. Smith*, *supra*, 30 Cal.4th at p. 611.) We independently review the trial court's determination that the prosecution's efforts to locate an absent witness are sufficient to justify an exception to the defendant's right of confrontation. (*Cromer*, at p. 901.)

Here, our independent review satisfies us that the evidence supports the court's determination. The court held an evidentiary hearing on the due diligence issue. Solano County District Attorney's Investigator Arthur Gerrans testified about his efforts over the course of 18 months to find and serve Clay for various court dates leading up to and including the trial. Gerrans first attempted to find and serve Clay in September 2004, for the November 2004 preliminary hearing. At that time he had a listing for Clay's address at his mother's home at 6 Tolentino Drive. Gerrans went there several times but found no one home. He left a business card, but was not contacted. He tried Clay's cell phone number and found it was no longer in service.

On October 1, 2004, Gerrans called the home number at 6 Tolentino Drive and spoke to Clay's mother, Ketora Clay. Ms. Clay told him her son still lived there, but that he did not want to talk to the police or be involved in the trial. She agreed to help Gerrans, and with her assistance Gerrans was able to serve Clay at the Tolentino Drive address on October 5, 2004.

Clay appeared and testified at the preliminary hearing and a second preliminary hearing on December 10, 2004. The trial date was scheduled for May 23, 2005, and then reset for July 18, 2005, and again for February 27, 2006. While it is unnecessary to exhaustively recount Gerrans's numerous different attempts to locate and serve Clay for these trial dates, we note that he made 23

10

attempts for the May 23, 2005, date before he successfully served Clay; he then made 11 attempts to serve Clay for the July 18, 2005, date before he was able, again with Ms. Clay's intervention, to arrange a meeting and serve Clay with a subpoena; and then he made another 23 attempts before he managed to effect service for the February 27, 2006, trial date. The majority of these attempts involved visiting and calling Ms. Clay at the Tolentino Street address. Gerrans also ran a criminal history check on Clay, checked Department of Motor Vehicles (DMV) records and other information from the Vallejo Police Department, ran a Solano County public records check, gave a subpoena to Detective Reynolds with the Vallejo Police Department, contacted Clay's former employer, United Parcel Service (UPS), for current information, and ran Clay's information through the district attorney's "Crimes" database and county welfare records. He did not check postal records because Ms. Clay had told him that Clay moved out of his parents' house and was transient and staying with various friends while "on the run."

The trial was ultimately reset for April 10, 2006. Gerrans made 39 more attempts to serve Clay, but was ultimately unsuccessful. On January 11, 2006, he discovered that Clay had been cited on July 22, 2005, for false impersonation and driving on a suspended license. Gerrans checked the district attorney's database but found no information about any court appearances on Clay's citation. After the trial date was continued until April, he investigated further and learned that Clay had a court date scheduled for March 10, 2006. Gerrans attended the hearing but Clay failed to appear. Gerrans put a hold in Clay's file and re-quested to be notified if Clay were to be rearrested. He also examined Clay's citation and reviewed the court file for any new contact information, but there was none.

Gerrans returned to the UPS facility to ascertain whether Clay had resumed his former job or had provided UPS with new contact information, also to no avail. An updated DMV records check on January 11, 2006, still showed Clay had a suspended license and lived at the Tolentino address. A check of county welfare records also produced no new information.

Gerrans met with Clay's parents at their home on February 25 or February 26. Clay's father knew nothing about his son's whereabouts, and both parents were upset by Clay's failure to keep in contact with them. Ms. Clay said that Clay would drop by on occasion, but she had no phone number or address for him. She said that at one point she knew Clay had been staying with a girlfriend, but she refused to give Gerrans the girl's name or phone number. She explained that Clay was transient and staying with "all kinds of different girls and different people." Investigator Gerrans last spoke with Ms. Clay on April 7, 2006, the Friday before trial began. She promised to call Gerrans if her son contacted her over the weekend.

The court found that Gerrans exercised due diligence in his efforts to find Clay. It explained that "defendants are entitled to a fair trial, not a perfect one, and as a taxpayer in this county, you know, I, like

11

everybody else, hope that our law enforcement agencies that we pay for do[ing] a good job and that we get a dollar's worth of work for a dollar's worth of our taxpayers' dollars. And I think that although the efforts in this case may not have been perfect, and it appears they were not successful, that extreme due diligence was exercised...." We agree. The record reflects diligent and prolonged efforts to locate and serve Clay to compel his attendance at trial, starting in September 2004 and continuing intermittently until the trial began in April 2006. Although defendant criticizes Investigator Garran's efforts to find Clay at his mother's home as "geared toward finding him at a place where for at least a year or longer he knew that Clay would not be located," the criticism falls wide of the mark. Ketora Clay was Garran's strongest connection to Clay, and his painstaking cultivation of that connection, with some success, was the most likely means for Gerrans to contact and serve Clay. It was eminently reasonable to pursue that avenue of investigation.

This is a far cry from the situation in *Cromer* on which defendant relies. The prosecution there knew that a witness disappeared in June 1997, but made no serious effort to locate her until a month before trial in December 1997. Even then, the prosecution's investigators' only efforts were to visit the witness's former address five or six times after being told she no longer lived there. Two days before trial they were told the witness was staying at her mother's house, but they delayed going to the mother's house for another two days. When they finally did, a woman told them the mother would be gone until the following day and that the witness did not live there. The investigators left a subpoena for the witness but did not return the next day or attempt to contact the mother by other means. (*People v. Cromer*, *supra*, 24 Cal.4th at pp. 903-904.)

Here, the prosecution began its investigation early and renewed efforts to locate Clay over a period of some 18 months each time the trial date was reset. Gerrans made numerous visits to Clay's mother because she was his best link to Clay, and was willing to help the prosecution contact her son. Gerrans also contacted Clay's former employer more than once, searched criminal and welfare databases, and attempted to serve Clay at a hearing in a different matter. No similar effort was shown in *Cromer*.

While it is true that Gerrans could have pursued additional avenues of investigation-defendant specifically faults him for failing to search postal records and pursue potential leads from a civil paternity case against Clay-there is no indication that these efforts would have borne fruit.[N.2] In any event, "[d]efendant's contention that the People should have done more ... is irrelevant to our analysis. 'That additional efforts might have been made or other lines of inquiry pursued does not affect [our] conclusion.... It is enough that the People used reasonable efforts to locate the witness.'" (*People v. Wise* (1994) 25 Cal .App.4th 339, 344; *see also People v. Guiterrez* (1991) 232 Cal.App.3d 1624, 1641 [the prosecution "need not exhaust every potential avenue of investigation to satisfy its obligation to use due diligence ...."], disapproved on another point in People v. Cromer, supra, 24 Cal.4th at p. 901, fn. 3.) Diligence, not perfection, is the required

12

> standard. We agree with the trial court that the prosecution's efforts demonstrate due diligence.
>
> > [N.2] Defendant also complains that Gerrans could have tried to serve Clay at three prior court dates in other cases, but overlooks that those dates were all well before the February 26, 2006, trial date for which Gerrans had successfully located and served Clay.

Hughes, 2008 WL 3889946 at **5–8.

In Hardy v. Cross, the Supreme Court held that the state court of appeal's application of Confrontation Clause precedent was not unreasonable where the State, in an unsuccessful effort to reach the witness, contacted the witness's family, checked public records, and inquired at local hospitals, local institutions, the morgue, and the post office. 132 S.Ct. 490, 493 (2011). In addition, the Supreme Court stated that, under AEDPA, a federal court may not overturn a state's decision simply because the federal court would have required the State to do more:

> As we observed in *Roberts*, when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, *see* 448 U.S. at 75, 100 S.Ct. 2531, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry no matter how unpromising. And, more to the point, the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.

Id. at 495.

As the appellate court explained, the District Attorney Investigator Arthur Gerrans successfully served Clay for the preliminary hearing on December 10, 2004 and the first two trial dates. He did so with the help of Ms. Clay. However, in February 2006, Clay's parents notified Gerrans that they had no contact information for Clay. After learning that Clay had a March 10, 2006 appearance, Gerrans attempted to serve Clay at the courthouse. Clay failed to appear. Gerrans utilized the resources that were useful and available to him at the time—Clay's mother, Clay's former employer, hearings in other matters, and criminal and welfare databases. The state court decision that such efforts were not violative of the Confrontation Clause was not an unreasonable application of clearly established law.

Petitioner contends Gerrans should have served Clay at the courthouse and had several opportunities to effectuate such service. Clay appeared in Solano County Superior Court on false impersonation charges in September 29, 2005, November 3, 2005, and December 27, 2005 and that Gerrans did not attempt to serve Clay at the courthouse until the March 10, 2006 appearance where Clay failed to appear. As discussed above, even if the undersigned were to agree with petitioner, a federal court may not overturn the state court's decision on unavailability merely because it identifies additional steps that could have been taken. See Hardy, 132 S.Ct. at 495.

Finally, petitioner contends the declarations of Timothy and Ketora Clay demonstrate a violation of petitioner's Sixth Amendment right to confrontation. Both Timothy and Ketora Clay declared that Gerrans affirmatively told Clay to "get lost during trial." ECF No. 54-1, Exs. F, G. However, as more fully discussed below, the state court found Timothy Clay not credible and denied petitioner's Sixth Amendment claim. For reasons expressed in the previous Order and again below in part , the court found that petitioner was not entitled to an evidentiary hearing on the issue of Clay's credibility. As to Ketora Clay, her declaration was never presented to the state court. The undersigned refused to consider that declaration in denying petitioner's request for an evidentiary hearing and will do so here. See ECF No. 74, at 18 (citing Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2001) [only those evidentiary submissions which were before the state court can be determinative of whether the state court acted AEDPA unreasonably]). Because the undersigned considers these declarations either not credible or not properly before the court, petitioner's Sixth Amendment claim based on the statements made in the declarations of Timothy and Ketora Clay should be denied. The state court's decision rejecting petitioner's Sixth Amendment claim based on Clay's unavailability was not an unreasonable application of clearly established federal law.

B.  Determination of the Facts

Petitioner also contends that the state court's decision is based on an unreasonable determination of the facts because 1) the California Court of Appeal's opinion was based on a mistaken view of the facts and 2) the state court improperly found Timothy Clay not credible without holding an evidentiary hearing. The undersigned rejected petitioner's first contention

14

reasoning as follows:

> Petitioner contends that footnote two of the California Court of Appeal's opinion was a mistaken view of the facts and thus, the state court's decision was based on an unreasonable determination of the facts. The footnote states that Gerrans successfully served Clay for the February 26, 2006 trial date. The court has previously found that the "record is at best unclear regarding whether the prosecutor was successful in serving Clay with a subpoena after May 2005." ECF No. 30, at 14–15.
>
> However, as respondent asserts, the footnote was presented as an after-thought by the court and thus was not material to its conclusion that the State had been diligent in attempt to serve Timothy Clay. Hughes, 2008 WL 3889946 at *8. The text preceding this footnote dismissed petitioner's suggestion that the district attorney should have done more. Id. The state court's decision relied upon the state's "diligent and prolonged efforts to locate and serve Clay to compel his attendance at trial, starting in September 2004 and continuing intermittently until the trial began in April 2006." Id. at *7. As noted above, a federal court may not overturn the state court's decision on unavailability merely because it identifies additional steps that could have been taken. See Hardy, 132 S.Ct. at 495. Accordingly, the state court's decision rejecting petitioner's Sixth Amendment claim based on unavailability was not based on a mistaken reading of the state court record.

ECF No. 74, at 15–16. The undersigned need not elaborate further on that point.

As to petitioner's second contention—that the state court's determination of Clay's credibility without an evidentiary hearing was an unreasonable determination of the facts—the undersigned discussed this contention at length in denying petitioner's request for an evidentiary hearing. ECF No. 74, at 16–22. The Solano Superior Court denied petitioner's state habeas petition requesting that it consider the declaration of Timothy Clay as newly-discovered evidence in support of his claims. The Solano Superior Court concluded as follows:

> On April 2, 2012, Petitioner Deangeleo Hughes filed this petition for writ of habeas corpus. Petitioner seeks to overturn his criminal conviction in case number VCR174438 based on newly discovered evidence. Namely, Petitioner presents an affidavit allegedly authored by Timothy Clay, who testified as a witness at Petitioner's preliminary hearing and whose testimony was introduced at Petitioner's trial, in which Mr. Clay states that he saw another man commit the crimes Petitioner was convicted of. Mr. Clay also asserts that he lied to police about seeing Petitioner commit the crime because he was jealous of Petitioner's relationship with a woman, Petitioner paid him $500.00 to recant statements inculpating Petitioner at the preliminary hearing, and the D.A.'s investigator instructed Mr. Clay to leave the county so that he

15

> would be unavailable at trial.
>
> Petitioner fails to sate a prima facie case for relief with regard to this newly discovered evidence claim. (*People v. Duvall* (1995) 9 Cal.4th 464, 475.) The affiant here, Mr. Clay, lacks credibility. (*In re Weber* (1974) 11 Cal.3d 703, 723-25; *In re Hall* (1981) 30 Cal.3d 408, 418.) Considering Mr. Clay's lack of credibility, Petitioner has failed to show entitlement to the relief on his claim of actual innocence. (*In re Lawley* (2008) 42 Cal.4th 1231, 1239 & 1245-46; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1246.)

ECF No. 54-1, at 15–16. The undersigned concluded that state court's decision was not AEDPA unreasonable in determining Clay's lack of credibility on the face of Clay's declarations. ECF No. 74, at 18. The undersigned noted that recantations of given testimony are generally disfavored and "Clay's declaration/recantation is an example of why the Ninth Circuit adopts this view. ECF No. 74, at 19.

> The first, unsanitized declaration given for petitioner's habeas proceeding is then written, but not by Clay. Because Clay asserts grammatical and writing insufficiencies, he pours out his "final" story on an impulse to a complete stranger at a coffee shop. This person then gives Clay the final product which accounts for important evidence presented at the trial Clay avoided (but somehow Clay knows), most importantly, the DNA evidence tying petitioner to the shirt worn and used by the assailant. Not surprisingly, Clay is unwilling or unable to identify this scrivener, a person learned in the law who performed this service for Clay and then vanished.
>
> Just to recite the back and forth of Clay's first habeas declaration is to recognize the utter disingenuousness of the entire declaration, including the most recent "another guy did it" rendition. Clay's credibility has been so irreparably damaged, no credence could be placed on his exculpatory version. While what is really motivating the present assertion that petitioner did not commit the crime will probably never be clear, in light of the entirety of the declaration, a reasonable fact finder could not find the most recent Clay version credible.

ECF No. 74, at 20–21. To reiterate, the state court's determination, without an evidentiary hearing, that Clay lacked credibility was not an unreasonable determination of the facts. Accordingly, the same court's decision that petitioner's Sixth Amendment Claim lacked merit was not based on an unreasonable determination of the facts. Petitioner's sixth amendment claim should be denied.

////

III. Prosecutorial Misconduct

Petitioner also contends the prosecution, *via* Investigator Gerrans, committed misconduct by actively dissuading Timothy Clay from testifying at trial. A prosecutor's error or misconduct does not, per se, violate a criminal defendant's constitutional rights. See Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (for the purposes of federal habeas corpus review, the standard of due process applies to claims of prosecutorial misconduct); Campbell v. Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)). On habeas corpus review, allegations of prosecutorial misconduct merit relief "only if the misconduct rises to the level of a due process violation-not merely because [the reviewing court] might disapprove of the prosecutor's behavior." Towery v. Schiriro, 641 F.3d 300, 306 (9th Cir.2010).

The question to be resolved is whether the alleged prosecutorial misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Hall v. Whitley, 935 F.2d 164, 165 (9th Cir.1991) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In order to determine whether misconduct occurred, it is necessary to examine the entire proceedings and place the prosecutor's conduct in context. Greer v. Miller, 483 U.S. 756, 765–766, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Factors to be considered in determining whether habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether his comments implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of evidence against the defendant. Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "[T]he Darden standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations,' (Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004))." Parker v. Matthews, - - - U.S. – – – – , ––– S.Ct. ––––, ––– L.Ed.2d – – – – , 2012 WL 2076341 *6 (2012). Thus, even where a prosecutor's argument, questions or behavior is found to be improper, relief is limited to cases in which a petitioner can establish that the misconduct resulted in actual, substantial

17

prejudice.

Criminal defendants have a due process right to present witnesses, compel their attendance, and present a defense. Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). "It is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'" Earp, 431 F.3d at 1170 (quoting United States v. Vavages, 151 F.3d 1185, 1188 (9th Cir. 1998)). Coercive or threatening behavior towards a potential witness may justify reversal of a defendant's conviction. See Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); Williams v. Woodford, 384 F.3d 567, 601–02 (9th Cir.2004) ("Undue prosecutorial interference in a defense witness's decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying.").

Petitioner alleges that Investigator Gerrans told Clay, a key witness, to not appear in court. Petitioner also alleges that the prosecutor also committed misconduct when he claimed a good faith effort in attempting to secure Mr. Clay's attendance, when in fact he told Clay he would not be testifying. "It has long been established that the prosecutions' 'deliberate deception of a court . . . by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" Banks v. Dretke, 540 U.S. 668, 694 (2004) (quoting Giglio v. United States, 405 U.S. 150, 153 (1972)). In support of these assertions, petitioner submits the declarations of Timothy and Ketora Clay. As discussed above, the state court concluded Timothy Clay lacks credibility and the declaration of Ketora Clay was never before the state courts. Given that Clay's declaration is the *only* source of this information properly presented in this habeas action and given Clay's complete lack of credibility, the state court's denial of petitioner's prosecutorial misconduct claim cannot be found AEDPA unreasonable. Petitioner's prosecutorial misconduct claim should be denied.

CONCLUSION

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the

18

denial of a constitution right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and
2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a documents should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 23, 2015

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:016/Hugh3024fr